## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Brock W. D.,                                          Case No. 24-cv-01101 (ECW)

        Plaintiff,

v.                                                                    **ORDER**

Leland Dudek,[1]
Acting Commissioner of Social Security,

        Defendant.

_____

This matter is before the Court on Plaintiff Brock W. D.'s ("Plaintiff") Brief in Support of his Complaint (Dkt. 9) and the Defendant Acting Commissioner of Social Security's ("Defendant" or "the Commissioner") SSA Brief (Dkt. 11). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying his application for Social Security Disability Insurance ("SSDI") benefits.[2] (Dkt. 1.) For the reasons stated below, Plaintiff's request for remand is denied and the Commissioner's decision is affirmed.

_____

[1] The Complaint named Martin O'Malley, who was the Commissioner of the Social Security Administration when Plaintiff filed his Complaint. (*See* Dkt. 1.) Leland Dudek became the Acting Commissioner of Social Security on February 19, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for Martin O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.     BACKGROUND

Plaintiff filed a Title II and Title XVIII application for disability insurance benefits on January 11, 2022, alleging disability beginning September 30, 2019.[3]  (R. 192, 195.)[4] Plaintiff's application alleged disability due to Loeys-Dietz Syndrome, arthritis, neuroma in his left foot, failed surgeries in his right hand/thumb, and severe anxiety from waking up during surgery.  (*See* R. 88.)  His application was initially denied on February 22, 2022 (R. 105-06), and denied on reconsideration on August 9, 2022 (R. 111-12). Plaintiff requested a hearing before an administrative law judge ("ALJ") on August 24, 2022.  (R. 115-16.)  ALJ Nicholas Grey ("the ALJ") conducted an online virtual hearing on Plaintiff's application on March 21, 2023.  (*See* R. 19, 42.)  The ALJ issued an unfavorable decision on May 17, 2023, finding that Plaintiff was not disabled from the application date through the date of the ALJ's decision.  (R. 19-36.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a)[5] (R. 20-21), the ALJ first determined at step one that Plaintiff had not

---

[3]     Plaintiff previously applied for SSDI benefits on November 9, 2016, but that application was denied.  (*See* R. 72-85 (prior ALJ opinion).)

[4]     The Social Security Administrative Record ("R.") is available at Docket Entry 4.

[5]     The Eighth Circuit has described the five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual

engaged in substantial gainful activity since September 30, 2019.  (R. 21.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: Loeys-Dietz syndrome ("LDS")[6]; left foot neuroma; right tibiotalar chondromalacia; right thumb carpometacarpal ("CMC")[7] osteoarthritis status post arthroplasty (June 3, 2020 and April 6, 2021); right shoulder degenerative joint disease; cardiomyopathy; and lumbar and cervical degenerative disc disease.  (R. 22.)  The ALJ also found Plaintiff's mental impairments of anxiety and depressive disorder, whether considered singly or together, were nonsevere.  (R. 22-23.)

At step three, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 25-27.)

---

functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

[6]      Loeys-Dietz Syndrome is "a disorder that affects the connective tissue in many parts of the body," which is characterized by an enlarged aorta and can cause increased risk of aneurysms, skeletal problems, and immune system-related problems.  *See* Loeys-Dietz Syndrome, MedlinePlus, https://medlineplus.gov/genetics/condition/loeys-dietz-syndrome (last visited Mar. 27, 2025).

[7]      The carpometacarpal, or CMC, joint is located at the base of the thumb and allows the thumb to move freely in many directions.  *See* Understanding Carpometacarpal Osteoarthritis, Saint Luke's, https://www.saintlukeskc.org/health-library/understanding-carpometacarpal-osteoarthritis (last visited Mar. 27, 2025).

At step four, after reviewing the entire record, the ALJ found Plaintiff's residual functional capacity ("RFC") to be as follows:

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) except: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours and standing and/or walking for 2 hours out of a typical workday; frequent reaching and handling.

(R. 27.)

In arriving at this RFC, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 29.) The ALJ also determined that Plaintiff was unable to perform any past relevant work; was 39 years old, or defined as a "younger individual age 18-44," on the alleged disability onset date; had at least a high school education; and that the transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. (R. 35.)

At step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform, such as Officer Helper (Dictionary of Occupational Titles ("DOT") No. 239.567-010, Light/Unskilled, SVP-2, of which there are 88,000 jobs in the national economy); Inspector, Hand Packager (DOT No. 559.687-074, Light/Unskilled, SVP-2, of which there are 80,000 jobs in the national economy); and Electrical Assembly (DOT No. 729.687-010, Light/Unskilled, SVP-2, of which there are 85,000 jobs in the national economy). (R. 36.)

Accordingly, the ALJ found that Plaintiff was not disabled since September 30, 2019, the alleged onset date of Plaintiff's disability, through the date of the May 17, 2023 decision. (R. 36.) On January 26, 2024, the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-4.) Plaintiff then commenced this action for judicial review seeking remand to the Commissioner for a proper RFC evaluation and additional vocational testimony. (Dkt. 1; Dkt. 9 at 17.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record in its analysis only when it is helpful for context or necessary for resolution of the specific issues presented by the parties.

A claimant is entitled to SSDI benefits beginning when they can prove disability regardless of when the application was filed. 20 C.F.R. §§ 404.316(a). All information in the record can be used to make a disability determination. 20 C.F.R. § 404.1520(a)(3); *see Vendenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (holding that an "ALJ was entitled to consider all of the evidence in the record," including evidence from before the disability onset date).

## II.        RELEVANT FACTUAL RECORD

The Court discusses the medical record insofar as it relevant to its analysis, focusing on Plaintiff's mental health treatment and issues relating to his right hand.

**A.      Medical Record Before the ALJ**

On October 9, 2018, Plaintiff was seen by Sarah F. Ames, APRN, CNP, with the North Memorial Comprehensive Pain Management Center ("Pain Center") to discuss pain in his low back, both shoulders, right thumb, and right ankle.  (R. 833-34.)  He indicated that his pain level was 6/10 but had gotten worse, while his activity level had increased.  (R. 834.)  Plaintiff's medications at the time included ibuprofen; losartan[8]; methocarbamol[9]; metoprolol succinate[10]; omeprazole[11]; oxycodone; Percocet; rizatriptan[12]; and tramadol.[13]  (R. 835.)  Plaintiff reported a history of anxiety and depression, but denied suicidal thoughts.  (R. 834.)  On examination, Plaintiff was awake, alert, oriented, and had a normal affect.  (R. 836.)

---

[8]      Losartan is a medication used to treat high blood pressure.  Losartan, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695008.html (last visited Mar. 27, 2025).

[9]      Methocarbamol, brand name "Robaxin," is a medication used to treat muscle pain and stiffness.  Methocarbamol Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18400-methocarbamol-tablets (last visited Mar. 27, 2025).

[10]      Metoprolol is a medication used to treat high blood pressure.  Metoprolol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682864.html (last visited Mar. 27, 2025).

[11]      Omeprazole is a medication used to treat heartburn.  Omeprazole, MedlinePlus, https://medlineplus.gov/druginfo/meds/a693050.html (last visited Mar. 27, 2025).

[12]      Rizatriptan is a medication used to treat migraine headaches.  Rizatriptan, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601109.html (last visited Mar. 27, 2025).

[13]      Tramadol is a short-term treatment for severe pain.  Tramadol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695011.html (last visited Mar. 27, 2025).

Plaintiff was seen by Babatunde A. Adekola, MD, with the Pain Center on December 21, 2018.  (R. 827.)  Plaintiff reported increased thumb pain with the cold weather and indicated that he had received an injection from a rheumatologist a week prior that resulted in no benefit.  (R. 828.)  His pain was 6/10.  (R. 828.)  Plaintiff reported that the Percocet was effective for severe pain but that his Robaxin, ibuprofen, and tramadol were waning in efficacy.  (R. 828.)

On December 26, 2018, Plaintiff called M Health Fairview Southdale Hospital to report an issue with his thumb and inquired whether Shamane Kimara March, MD, had any recommendations for an orthopedic physician.  (R. 484-85.)  Tyler Joseph Graf, RN, informed Plaintiff that Dr. March would leave a voicemail with that information, and notes indicate that RN Graf later called Plaintiff to tell him that Dr. March did not know anyone but would be happy to talk to anyone if Plaintiff needed.  (R. 484-85.)

On January 16, 2019, Plaintiff was treated for right thumb pain by Michael J. Forseth, MD, at Summit Orthopedics.  (R. 385.)  Dr. Forseth wrote:

> [Plaintiff] is a 38 year old left hand dominant male seen today at the request of Dr Freehill for initial evaluation of his right hand. He currently works as a PCA [personal care attendant]. Complains of pain right thumb CMC joint. He has a history of a soft tissue disorder, Loeys-Dietz Syndrome, which is apparently similar to Marfan syndrome. Causes soft tissue laxity. He did have an injury as a child to his right thumb CMC joint. No surgery. At this point he complains of pain right thumb CMC joint. Hurts with gripping and grasping activities. No numbness or tingling. No symptoms on the contralateral dominant left hand. He's had a forearm splint without much relief. He is also had a cortisone injection to his right thumb CMC joint with no relief.

(R. 386 (errors in original).)  An examination of Plaintiff's right hand found mild

edema.[14]  (R. 385.)  Dr. Forseth issued Plaintiff a custom splint and instructed Plaintiff to

wear it during the day, while sleeping, and as needed to decrease pain, and Plaintiff stated

he understood.  (R. 385.)  Dr. Forseth also concluded:

> Examination of his right hand demonstrates tenderness over the right thumb
> CMC joint. Crepitance and instability is noted. He has diffuse soft tissue
> laxity. No motor or sensory deficits. No symptoms, tenderness in the
> contralateral left hand. There is full sensation noted in bilateral hands in the
> median, radial, and ulnar nerve distribution. No motor deficits, no atrophy.
> There is a palpable radial pulse bilaterally and brisk capillary refill
> throughout. No overlying skin changes are seen, no erythema,[15] no
> ecchymosis,[16] no swelling. General appearance findings show the patient to
> be oriented to person, place, and time, well developed, well nourished and in
> no acute distress patient does not appear to be depressed.

(R. 386.)  X-ray imaging that day found advanced thumb CMC joint osteoarthritis.  (R.

386.)

Plaintiff was seen by Justin O. Ongaga, APRN, CNP, at the Pain Center on

January 21, 2019 complaining of right thumb, low back, and right ankle pain, but stating

that his main issue was right thumb pain.  (R. 823, 826.)  He reported that his pain was

---

[14]     "Edema is swelling caused by too much fluid trapped in the body's tissues."
Edema, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/edema/symptoms-
causes/syc-20366493 (last visited Mar. 27, 2025).

[15]     Erythema is a type of allergic reaction from an infection or another trigger.
Erythema Multiforme, Medline Plus, https://medlineplus.gov/ency/article/000851.htm
(last visited Mar. 27, 2025).

[16]     Ecchymosis is the medical term for bruising.  Bruises (Ecchymosis), Cleveland
Clinic, (Jan. 1, 2023), https://my.clevelandclinic.org/health/diseases/15235-bruises (last
visited Mar. 27, 2025).

worse than the last visit, but that it was only 3/10 despite maintaining the same activity level.  (R. 823.)  Plaintiff stated that he was wearing a brace at night.  (R. 826.)

During a visit to the Pain Center on January 28, 2019, where Plaintiff's chief complaint was right thumb and low middle back pain, he reported to CNP Ongaga that his present pain score was 9/10, despite a decrease in activity.  (R. 819.)  Plaintiff was in no acute distress nor had suicidal ideation, was alert and oriented, and had a normal affect.  (R. 819-20.)

On February 18, 2019, Plaintiff was seen by Dr. Forseth, who assessed Plaintiff with: "Right thumb CMC joint osteoarthritis, Loeys Dietz Syndrome (diffuse soft tissue laxity)."  (R. 383.)  Dr. Forseth also opined:

> Given his soft tissue laxity, I think possibly a thumb CMC fusion with distal radius bone autograft might be a better option for him, especially at age 38. We discussed the risks and benefits of this, stiffness, inability to lay hand flat on the table, nonunion, painful hardware, etc. He wants to consider his options and then can contact us if he would like to proceed. In the meantime we'll see if a neoprene thumb spica sleeve could provide more relief. Therapy will provide him with that today.

(R. 383.)  Plaintiff had no numbness or tingling in the area, and stated that the splint did not provide any relief.  (R. 383.)  Dr. Forseth wrote:

> Examination of his right hand demonstrates instability of the right thumb CMC joint, crepitance, pain. Negative Tinel's,[17] Phalen's.[18] There is full

---

[17]    Tinel's sign is a tingling or "pins and needles" feeling when you get tapped on your skin over a nerve.  Tinel's Sign, Cleveland Clinic (Apr. 1, 2022), https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign (last visited Mar. 27, 2025).

[18]    Phalen's test is a series of hand and wrist movements used to diagnose carpal tunnel syndrome.  Phalen's Test, Cleveland Clinic (July 18, 2023),

sensation in the hand in the median, ulnar, and radial nerve distributions. No motor deficits are noted throughout, no atrophy is seen. Capillary refill remains brisk and they have a palpable radial pulse. The skin is intact with no ecchymosis, erythema, or rashes. Generalized laxity noted. General appearance findings show the patient to be oriented to person, place, and time, well developed, well nourished and in no acute distress patient does not appear to be depressed.

(R. 383.)  He also noted no issues with Plaintiff's left hand.  (R. 383.)

Dr. Forseth referred Plaintiff for a neoprene thumb spica sleeve to see if it "could provide more relief," and Plaintiff was treated by OTR/L Amanda L. Tschida Schirmers later that same day.  (R. 382, 383.)  Plaintiff complained of thumb pain, specifically burning and aching, but noted that the symptoms were relieved by using a brace.  (R. 382.)  Plaintiff reported limitations in his work as a PCA and in his ability to do pottery. (R. 382.)  Plaintiff said:

Thanks To genetics, I have a painful arthritic thumb. I use my hands a lot I am a PCA for an elderly gentleman with quadriplegia and I throw claw a lot. I have to use my thumb regularly. The last brace bunched up here (wrist) and was not comfortable, I am looking for something longer)

(R. 382 (errors in original).)  ORT/L Schirmers observed mild edema in Plaintiff's right hand and digits, and there was pain to the touch of the CMC joint.  (R. 382.)  ORT/L Schirmers provided Plaintiff with a new brace, which fit comfortably at the appointment, and instructed Plaintiff to wear it during the day, while sleeping, and as needed to decrease pain.  (R. 382.)  She also told Plaintiff to return as needed for adjustment,

---

https://my.clevelandclinic.org/health/diagnostics/25133-phalens-test (last visited Mar. 27, 2025.)

planned no further therapy, and planned to discharge Plaintiff if he did not return or seek further therapy in 90 days.  (R. 382.)

During a February 25, 2019 Pain Center visit, Plaintiff reported a pain score of 7/10 in his low back, right thumb, and both shoulders, with an increased activity level. (R. 815.)  During another Pain Center visit on March 25, 2019, Plaintiff stated that his pain was better, but was still an 8/10.  (R. 811.)  He noted that he injured his right thumb and right ankle in a fall that week but that the pain was getting better.  (R. 811.)  During a May 20, 2019 visit to the Pain Center for right foot pain, lower back pain, right shoulder pain, and right wrist pain, Plaintiff reported that his pain score was 7/10 and he had increased his activity.  (R. 804, 808.)  This visit focused on his right foot and lower back. (R. 808.)

Plaintiff saw Dr. March on June 14, 2019 for heart-related issues.  (R. 476.) However, Dr. March noted that Plaintiff continued to have right thumb and proximal forearm pain, and had some fibroids in his wrist that was causing him difficulty in doing pottery.  (R. 476.)  Dr. March wrote that Plaintiff's pain was 7-8/10 and noted that Plaintiff was being seen by the Pain Center, where cupping[19] was the only thing that provided him short-term relief.  (R. 476.)  Plaintiff reported taking Percocet and tramadol

---

[19]    "Cupping therapy is an ancient healing method that may ease back pain, neck pain, headaches and other issues. It uses suction to pull on your skin and increase blood flow to the affected area."  Cupping Therapy, Cleveland Clinic (June 7, 2023), https://my.clevelandclinic.org/health/treatments/16554-cupping (last visited Mar. 27, 2025).

for pain, and was experiencing decreased sleep due to shoulder dislocation, lower back

hyperextension and spasm, and jaw dislocation.  (R. 476.)

During an August 14, 2019 Pain Center visit, Plaintiff reported his pain at 8/10

regarding his left shoulder, lower back, right wrist, and right ankle.  (R. 800.)  Plaintiff

indicated that he had no plans for thumb surgery at that time.  (R. 804.)  Then, during a

September 26, 2019 Pain Center visit, Plaintiff reported a 5/10 on the pain scale related to

his right ankle and both hands.  (R. 795.)  He also reported that his pain was worse and

his activity level had increased.  (R. 795.)  Plaintiff's alleged disability onset date,

September 30, 2019, was four days later.

Next, during a November 14, 2019 Pain Center visit regarding both thumbs and

feet, Plaintiff reported a pain level of 7/10, that the pain had gotten worse, and no change

in his activity level.  (R. 786.)  During a January 10, 2020 appointment at the Pain Center,

Plaintiff reported worse pain again, at a level of 6/10, relating to both shoulders, low

back, both hands, left foot, and right ankle, despite a decrease in activity.  (R. 782.)

On May 1, 2020, Plaintiff was again seen by Dr. Forseth for right thumb pain.  (R.

380.)  Dr. Forseth found significant tenderness over the CMC joint, which also had gross

instability, in addition to relatively nontender MP[20] and IP[21] joints.  (R. 380.)  He noted

---

[20]    MP, or metacarpophalangeal, joints are at the base of each finger.  Arthritis - MP
Joint, Mass. Gen. Hosp., https://www.massgeneral.org/orthopaedics/hand/conditions-and-
treatments/arthritis-mp-joint (last visited Mar. 27, 2025).

[21]    IP, or interphalangeal, joints are the two joints between the three bones in each
finger.  Interphalangeal Joint Arthritis (Finger Arthritis) Treatment, Penn Med.,
https://www.pennmedicine.org/for-patients-and-visitors/find-a-program-or-

no numbness or tingling, full sensation in both hands in the median, radial, and ulnar

nerve distribution, no motor deficits, no atrophy, and no swelling.  (R. 380.)  Dr. Forseth

wrote:

> We discussed surgical versus nonsurgical options. I think we should start
> with a cortisone injection. We discussed a cortisone injection. She [sic]
> consented to proceed with this cortisone injection. After sterile prep I
> injected the right thumb CMC joint with a half cc of 1% lidocaine and 1 cc
> of Kenalog-10. He tolerated the injection without difficulty, no complication.
> Resume activities as tolerated. Return to clinic as needed. Depending on how
> long the injection was his first pain relief she [sic] could be a candidate for
> either direction versus surgical intervention.

(R. 380.)

Plaintiff followed up with Dr. Forseth via telehealth on May 14, 2020.  (R. 379.)

Plaintiff stated that the cortisone injection gave him one hour of relief but then wore off.

(R. 379.)  Plaintiff complained that he was in quite a bit of pain and could not sleep at

night, further noting that the splint did not provide him much relief.  (R. 379.)  He

identified the CMC joint as being the most painful area.  (R. 379.)  Dr. Forseth reviewed

x-rays[22] that showed significant thumb CMC joint arthritis.  (R. 379.)  He further wrote:

> We discussed surgical options, arthroplasty[23] versus arthrodesis.[24] Given
> his age, activity level, and history of soft tissue laxity I think an arthrodesis

---

service/orthopaedics/hand-and-wrist-pain/arthritis-in-hand-and-wrist-treatment/
interphalangeal-joint-arthritis-treatment (last visited Mar. 27, 2025).

[22]    It is unclear from the record when these x-rays were taken.

[23]    Arthroplasty is a joint replacement procedure that replaces worn-out or damaged
bone in a natural joint with a prosthetic implant.  Arthroplasty (Joint Replacement),
Cleveland Clinic (Jan. 2, 2024), https://my.clevelandclinic.org/health/treatments/21649-
arthroplasty-joint-replacement (last visited Mar. 27, 2025).

[24]    Arthrodesis is a surgery that permanently fuses two bones in a joint together.

would be more reliable. The risks, benefits, rationale, and anticipated perioperative course of the procedure were discussed with [Plaintiff] this morning. Specific risks discussed with him include but are not limited to nonunion, malunion, painful hardware, infection, nerve and vascular injury, pain, stiffness, and possible need for future surgery. Arrangements to be made at his earliest possible convenience.

(R. 379.)

That same day, Plaintiff met with Leslie D. Anunciacion, PA-C, with North Memorial for a pre-operative exam. (R. 766-72.) PA-C Anunciacion did not clear Plaintiff for surgery because he needed "cardiac clearance" to "further risk stratify" Plaintiff. (R. 771.) PA-C Anunciacion recommended that Plaintiff not take his losartan the night before and day of his surgery. (R. 766, 771.)

Plaintiff saw Dr. Adekola on June 3, 2020 to discuss pain in his right hand, right ankle, and left leg. (R. 754.) He reported his pain was 10/10. (R. 755.)

Later that day, Plaintiff underwent arthrodesis surgery on his right thumb CMC joint as well as a right distal radius bone autograft with Dr. Forseth. (R. 377.) Dr. Forseth wrote that Plaintiff would be placed in either a thumb spica case for approximately four weeks or a thermoplastic thumb spica splint which could be removed for hygiene purposes. (R. 378.)

Plaintiff reported to occupational therapy for orthosis on June 11, 2020, and was seen by Ray V. Coyle, OTR/L. (R. 374-75.) Plaintiff reported mild to moderate pain in the thumb following surgery and that he had difficulty grasping objects and

---

Arthrodesis (Joint Fusion), Cleveland Clinic (Mar. 22, 2024), https://my.clevelandclinic.org/health/procedures/arthrodesis-joint-fusion (last visited. Mar. 27, 2025).

weightbearing through the right upper extremity. (R. 374.) OTR/L Coyle noted mild

edema and that the surgical incisions were healing uneventfully and without

complication. (R. 374.) OTR/L Coyle provided Plaintiff a custom splint to use per Dr.

Forseth's instructions. (R. 374.)

Plaintiff had a post-operation follow up with Ryan Roiger, PA-C, that same day.

(R. 376.) Plaintiff noted minimal pain and tolerated the splint well after surgery, which

Plaintiff had kept in place. (R. 376.) PA-C Roiger wrote:

> The splint and dressings were removed today, examination of his right hand
> reveals the wounds to be clean and dry, there is no sign or symptom of
> infection. Sutures were removed today. Motion in his thumb is decreased, he
> has full motion throughout the remainder of his right hand and wrist. He has
> full sensation throughout his right hand, there is good distal pulses and brisk
> capillary refill. There is minimal pain to palpation noted throughout his right
> hand. General appearance findings show the patient to be oriented to person,
> place, and time, well developed, well nourished and in no acute distress
> patient does not appear to be depressed.

(R. 376.) PA-C Roiger also took x-rays of Plaintiff's right thumb that day that revealed

the CMC joint was approximated, the hardware was in good placement, and there was no

sign of it loosening. (R. 376.) He planned to see Plaintiff again in four weeks for

reevaluation. (R. 376.) PA-C Roiger noted Plaintiff had received a splint that could be

removed for hygiene purposes, and also cautioned him from heavy use of his right hand.

(R. 376.)

Plaintiff saw Dr. Adekola on July 2, 2020. (R. 750.) He reported that his pain

levels were worse; he scored them as a 5/10, but that was "mainly" his right ankle. (R.

751.) Regarding his thumb surgery, Plaintiff indicated that he had been given oxycodone

for post-operative pain, but that was ineffective and resulted in pimples on his lower

15

back.  (R. 751.)  He had instead resumed the Percocet he took for chronic pain.  (R. 751.)

His physical activity had increased and included daily walks.  (R. 751.)  Plaintiff

expressed an interest in medical marijuana for pain management and Dr. Adekola advised

Plaintiff to let him know if he started medical marijuana so they could taper him off

Percocet.  (R. 750-51, 754.)

Plaintiff was seen by Dr. March on August 14, 2020 for heart-related issues.  (R.

436.)  She noted that Plaintiff had been "doing well," he continued to do pottery and

work as a PCA, and he was actively playing disc golf.  (R. 436.)

On August 26, 2020, Plaintiff had a telehealth follow-up appointment with Kerri

Hammer, PA-C, at North Memorial.  (R. 746.)  She indicated that Plaintiff continued to

struggle with joint pain and was unable to do heavy scrubbing in the kitchen or bathroom;

could not fully support a pan in order to strain water; and was unable to bathe himself

independently on bad days because he could not remove his shirt due to shoulder pain.

(R. 747.)  However, Plaintiff was still working 10-hour shifts two days a week in respite

care and was able to make very simple meals, monitor his medications, and go for a daily

walk.  (R. 747.)  Plaintiff indicated to PA-C Hammer that he was reapplying for disability

benefits after his earlier denial because his joint paint was gradually worsening.  (R. 747.)

He also noted that he was still having "significant pain" in his CMC joint following

surgery.  (R. 749.)

On January 6, 2021, Plaintiff again saw Dr. Adekola. (R. 736.) She noted that Plaintiff was placed on Belbuca[25] following an ankle surgery but was having side effects, including severe anxiety. (R. 737.) Plaintiff also told Dr. Adekola that his thumb surgery did not help his right hand pain. (R.737.) However, Plaintiff reported that his overall pain status had improved, he had a pain score of 5/10, and his activity level had decreased since his last visit. (R. 737.)

Plaintiff returned to see Dr. Adekola the next morning on January 7, 2021. (R. 732.) Dr. Adekola recommended that Plaintiff void his continuing service agreement with the Advanced Pain and Spine Clinic and set one up instead with the Pain Center. (R. 733.) Plaintiff noted that his overall pain status had improved and his current pain score was 3/10. (R. 733.) Plaintiff planned to begin tapering Belbuca. (R. 733.)

Plaintiff saw Dr. Adekola on January 19, 2021 complaining of right ankle, right thumb, and low back pain. (R. 724-25.) Plaintiff reported that his pain was improving since the last visit, was currently then a 2/10, and had reduced his activity level. (R. 725.) Dr. Adekola observed Plaintiff to be alert and oriented time three and cooperative, with a normal affect and attention span. (R. 726.) Plaintiff was prescribed hydroxyzine[26] for

---

[25]     Belbuca is a brand name for buprenorphine, a severe pain reliever. Buprenorphine (Buccal Mucosa Route, Sublingual Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/buprenorphine-buccal-mucosa-route-sublingual-route/description/drg-20074237 (last visited Mar. 27, 2025).

[26]     Hydroxyzine is a medication "used to control anxiety and tension caused by nervous and emotional conditions." Hydroxyzine (oral route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 (last visited Mar. 27, 2025).

withdrawal-induced anxiety, apparently due to his Belbuca taper, and was instructed to follow up again in two weeks.  (R. 728.)

On February 3, 2021, Plaintiff was seen by Dr. Adekola to discuss pain in his right ankle, right thumb, and lower back.  (R. 720-21.)  Plaintiff noted his pain was improving and that his pain score was 4/10, but that his physical activity level had decreased.  (R. 721.)  Plaintiff reported on his taper of Belbuca, which began on January 25, 2021, and Dr. Adekola noted that Plaintiff had called three days after beginning the taper to note severe GERD symptoms.  (R. 721.)  However, Plaintiff now attributed the GERD, which had abated, to a salty diet.  (R. 721.)  He also noted profuse sweating as a side effect of his taper.  (R. 724.)  Dr. Adekola noted Plaintiff's affect and attention span were normal and he was alert and oriented times three.  (R. 722.)

Plaintiff was seen by CNP Ames on February 15, 2021.  (R. 712.)  Plaintiff noted that his pain score was 3/10, he was doing physical therapy, and that he had been experiencing side effects from tapering Belbuca, specifically severe chills and anxiety, and wanted to speed up his taper timeline.  (R. 713.)  Plaintiff also believed he needed refills of his Belbuca, gabapentin, and methocarbamol, which he felt was helpful in decreasing his pain.  (R. 713.)  CNP Ames recommended that Plaintiff increase his doses of gabapentin and hydroxyzine.  (R. 717.)

Dr. Adekola treated Plaintiff on February 19, 2021 concerning his thumb, ankle, and back pain.  (R. 708.)  Dr. Adekola wrote that Plaintiff had taken his last dose of Belbuca two days prior, and wanted to restart Percocet to treat his subsequent increased pain.  (R. 709.)  Plaintiff stated his pain was 7/10, but also said his pain was about the

same as the last visit when it was 3/10.  (R. 709.)  He had decreased his activity level. (R. 709.)  Dr. Adekola restarted Plaintiff's Percocet prescription.  (R. 711.)  Plaintiff was alert and cooperative, had a normal affect and attention span, showed normal conversation, and was alert and oriented times three.  (R. 710.)

On March 16, 2021, Plaintiff returned to see Dr. Adekola to discuss his thumb, ankle, and back pain.  (R. 704.)  Plaintiff indicated that the pain in his right thumb and ankle had gotten worse due to increased activity related to standing and sculpting.  (R. 705.)  He mentioned that gabapentin and Robaxin were partially helpful; Plaintiff was also taking Percocet.  (R. 705.)  Plaintiff was described as alert and cooperative, had a normal affect and attention span, showed normal conversation, and was alert and oriented times three.  (R. 706.)

Plaintiff returned to Summit Orthopedics on March 17, 2021 reporting ongoing pain at the base of his right thumb, and was seen by PA-C Roiger.  (R. 371.)  PA-C Roiger noted that Plaintiff wore the splint initially after surgery but then discontinued it, and more recently was having pain with radial deviation and abduction of his thumb.  (R. 371.)  PA-C Roiger recounted:

> Their primary issue is with both hands, the right wrist and the fingers of the right hand. The patient is left hand dominant. The patient has been referred by for this visit. Patient's present condition began gradually 5 year(s) ago. Symptoms began at work. The condition does not appear to be work related. The patient is currently working. This resulted from repetitive motion patient is currently experiencing pain. Current pain is 9/10 Worst pain is 10/10. The timing of the symptom(s) is constant. The patient describes the complaint as sharp, burning and stabbing. Patient complains of catching, locking, weakness and discomfort. Symptom(s) exacerbated with flexion, rotation, gripping and repetitive motion. Symptom(s) relieved with prescription

medication, over-the-counter medication and application of heat. Patient had no falls in the past year.

(R. 371.)

PA-C Roiger's examination revealed that the surgical incision had healed and a scar had developed. (R. 371.) Plaintiff could make a composite fist, extend his fingers, had full motion of his wrist, and full sensation throughout his hand, but had pain to the touch at the CMC joint and with radial deviation. (R. 371.) Plaintiff was oriented to the person, place, and time, was in no acute distress, and did not appear depressed. (R. 371.) However, x-rays of Plaintiff's thumb

> reveal[ed] the hardware is in placement on his thumb metacarpal across the CMC joint into the trapezium. To [sic] the screws that are into the trapezium have broken, the most radial 1 as well as the center 1. The most ulnar screw in the trapezium is still intact, but there is evidence of lucency around the screw in the trapezium.

(R. 371.)

During his review of symptoms on March 17, 2021, Plaintiff reported trouble sleeping, feeling anxious, and feeling depressed, but also "no psychological symptoms." (R. 372.) Plaintiff's medications were listed as methocarbamol, metoprolol tartrate, ondansetron,[27] and Senexon.[28] (R. 372.) That same day, Susan J. Treptau, OTR/L, provided Plaintiff with a new splint to be worn full time except during hygiene. (R. 370.)

---

[27]    Ondansetron is a medication used to prevent nausea and vomiting caused by surgery. Ondansetron, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601209.html (last visited Mar. 27, 2025).

[28]    Senexon is a brand name for senna, a medication used to treat constipation. Senna, Medline Plus, https://medlineplus.gov/druginfo/meds/a601112.html (last visited Mar. 27, 2025.)

Plaintiff was seen by Claire K. H. Philippe, DO, for a pre-operation exam on March 25, 2021.  (R. 699.)  Plaintiff's judgment and mental status were clear, he had reasonable insight, and his mood was stable.  (R. 703.)  Dr. Philippe directed Plaintiff to not take his losartan on the day of his surgery.  (R. 704.)

On March 30, 2021, Plaintiff had a telehealth visit with Benjamin J. Lexau, PsyD, LP, of North Memorial Hospital.  (R. 696.)  Dr. Lexau diagnosed him with major depressive order, recurrent episode, mild, but postponed a diagnostic assessment to use the session to build rapport.  (R. 696-97.)  Dr. Lexau noted his mood and affect were appropriate and his memory and concentration were within normal limits.  (R. 696-97.)

Plaintiff had a second surgery on his right thumb on April 6, 2021, performed by Dr. Forseth.  (R. 369.)  The operation removed the hardware from the first surgery and completed a right thumb CMC suture suspension arthroplasty procedure.  (R. 369.)  The post-op plan included immobilizing the joint for six weeks in a splint.  (R. 369.)

Plaintiff presented to Jocelyn Bonk, PA-C, on April 12, 2021 with right wrist pain, stating he was experiencing a burning sensation and pressure in his distal radius which was at times causing a quick sharp pain into his forearm.  (R. 367.)  Plaintiff thought he might have snagged his thumb at one point but denied any significant injury since the operation.  (R. 367.)  He was able to extend all of his fingers fully but had difficulty making a fist due to pain.  (R. 367.)  Sensation was intact to light touch, while his wrist range of motion was deferred due to pain.  (R. 367.)  Plaintiff was alert and oriented times three, showed no acute distress, had no psychological symptoms and no depression, but was feeling anxious.  (R. 367.)  His surgical site was well-healed, and PA-C Bonk

21

determined that some of the pain was caused by the post-op plaster splint, where removal of the plaster splint resulted in "significant alleviation of discomfort."  (R. 367.)  A different splint was applied for thumb and wrist immobilization.  (R. 367.)  Plaintiff "found comfort with slight radial deviation of thumb," and the plan was to follow-up with Dr. Forseth's team in two days as previously scheduled.  (R. 367.)

On April 13, 2021, Plaintiff saw Dr. Adekola for pain in his right thumb, right ankle, and back.  (R. 692.)  Dr. Adekola noted that Plaintiff was taking oxycodone and Percocet following his thumb operations.  (R. 693.)  Dr. Adekola advised Plaintiff not to mix these post-op prescriptions with his existing Percocet prescription he used for chronic pain, instead pausing the Percocet until his post-op meds ran out.  (R. 693.) Plaintiff reported his pain 7/10.  (R. 693.)

Later that day, Plaintiff was seen by Dr. Lexau to complete a mental health assessment.  (R. 685.)  Plaintiff was "seeking care for help managing pain."  (R. 686.) During his visit, Plaintiff completed a Patient Health Questionaire-9 ("PHQ-9")[29] and a Generalized Anxiety Disorder assessment ("GAD-7").[30]  (R. 686-87.)  Plaintiff scored a 9

---

[29]    The PHQ-9 is a screening test to measure the severity of depression.  It is scored as follows: 0-4, none-minimal; 5-9, mild; 10-14; moderate; 15-19, moderately severe; 20-27, severe.  *See* Patient Health Questionnaire-9 (PHQ-9), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/phq-9 (last visited Mar. 27, 2025).

[30]    The Court assumes this assessment to be the Generalized Anxiety Disorder 7-item, or GAD-7, given Plaintiff takes the GAD-7 in later medical appointments and a score of 19 is referenced.  The GAD-7 is a screening test to determine if a patient has generalized anxiety disorder.  The scoring is as follows: 0-4, minimal anxiety; 5-9, mild anxiety; 10-14, moderate anxiety; 15 or greater, severe anxiety.  *See* Generalized Anxiety Disorder 7-item (GAD-7), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/gad-7 (last visited Mar. 27, 2025).

on the PHQ-9, indicating mildly severe depression symptoms, and a 12 on the GAD-7, indicating moderately severe anxiety symptoms. (R. 686-87.) Dr. Lexau noted that Plaintiff had never been diagnosed with a mental health condition, was "currently receiving no treatment for mental health," had "never been treated for any mental health condition," and had not been hospitalized for a mental health condition. (R. 688-89.) However, Plaintiff believed that he might have autism, as he reported having difficulty interpreting social cues and was "hyper organized." (R. 689.)

Plaintiff endorsed a history of panic attacks following heart surgery but denied agoraphobia. (R. 689.) Plaintiff denied having symptoms of social anxiety disorder. (R. 689.) Plaintiff acknowledged a history of obsessive thinking and/or compulsive behaviors, specifically regarding keeping his home and things organized. (R. 689.) Plaintiff also endorsed symptoms of ADHD and claimed he was diagnosed as a child. (R. 689.) Plaintiff also cited past traumatic experiences such as multiple motor vehicle accidents and becoming conscious during two different surgeries. (R. 690.) He reported experiencing repeating, disturbing, and unwanted memories about those experiences. (R. 690.) Plaintiff also reported being very stressed about his financial situation and had found himself crying in recent weeks because of those worries. (R. 690.) Dr. Lexau observed Plaintiff to have an appropriate mood and affect and his memory and concentration were within normal limits. (R. 691.)

Dr. Lexau provided provisional diagnoses of Generalized Anxiety Disorder ("GAD") and major depressive disorder, recurrent episode, mild, while also exhibiting symptoms of post-traumatic stress disorder ("PTSD"). (R. 691.) The PTSD diagnosis

was not assessed in detail.  (R. 691.)  Dr. Lexau stated that the functional impact of

Plaintiff's symptoms had occurred every day for the past 12 years and were rated as

severely intense.  (R. 691.)  Plaintiff's medications were listed as albuterol-ipratropium,[31]

gabapentin, losartan, methocarbamol, metoprolol succinate, Percocet, and rizatriptan.  (R.

688.)

Plaintiff met with PA-C Roiger as a follow-up from his second surgery on April

14, 2021.  (R. 365.)  Plaintiff reported that he had visited the clinic for an uncomfortable

splint and was re-splinted, but that new splint had caused too much tension across his MP

joint.  (R. 365.)  He reported significant pain in that area.  (R. 365.)  He denied any

decreased sensation in his hand.  (R. 365.)  PA-C Roiger wrote:

> His splint and dressings were removed today, examination of his right hand
> reveals the incision at the base of the thumb is healed, sutures were removed
> and replaced with benzoin and Steri-Strips. I did not test motion of his thumb
> or wrist, he has full motion throughout remainder of the right hand. He has
> full sensation throughout the hand, there is good distal pulses and brisk
> capillary refill. There is pain to palpation at the base of the thumb at the CMC
> joint and to the MP joint of the thumb. General appearance findings show the
> patient to be oriented to person, place, and time, well developed, well
> nourished and in no acute distress . patient does not appear to be depressed.

(R. 365 (errors in original).)

X-rays confirmed the previous hardware in his thumb was absent.  (R. 365.)

Plaintiff was placed in a well-padded forearm-based thumb spica cast, which he reported

---

[31]    "Albuterol is used to prevent and treat difficulty breathing, wheezing, shortness of
breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic
obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and
airways)."  Albuterol Oral Inhalation, MedlinePlus, https://medlineplus.gov/druginfo/
meds/a682145.html (last visited Mar. 27, 2025).

was comfortable. (R. 365.) PA-C Roiger then refilled Plaintiff's Percocet for pain and planned to see him back in two to three weeks. (R. 365.)

Plaintiff returned to be seen by Dr. Forseth on April 23, 2021. (R. 363.) Dr. Forseth found Plaintiff to be doing well, although he reported that the cast was uncomfortable, giving him a difficult time at night. (R. 363.) He occasionally got some numbness and tingling around the hand. (R. 363.) Dr. Forseth observed:

> Examination of the right hand demonstrates a nicely healed incision, no signs of infection. Thumb is in the appropriate position. He can oppose the thumb to the tip of the small finger now. There is full sensation noted in bilateral hands in the median, radial, and ulnar nerve distribution. No motor deficits, no atrophy. There is a palpable radial pulse bilaterally and brisk capillary refill throughout. No overlying skin changes are seen, no erythema, no ecchymosis, no swelling.

(R. 363.) Dr. Forseth further opined: "I think he is on track. We will adjust his thermoplastic splint. He will wear that most of the time, he is just a month out now. I will see him back in a month and potentially begin an exercise program at that point."

(R. 363.) Plaintiff saw OTR/L Coyle later that day to adjust his splint. (R. 362.)

PA-C Roiger again saw Plaintiff on April 29, 2021. (R. 360.) PA-C Roiger noted that Plaintiff's cast had been removed a week prior and he had been wearing a thumb spica splint since, removing it for some gentle range of motion. (R. 360.) Plaintiff reported weakness in his hand; numbness or shooting sensation in his thumb, index, and middle finger when he extended his elbow and shoulder; and pain at his proximal arm from time to time. (R. 360.) Plaintiff also expressed feeling anxious and depressed, with trouble sleeping. (R. 360.) PA-C Roiger wrote:

> Examination of his right upper extremity reveals the incision is healed at the base of the thumb, there is a well-formed scar. I did not test motion of the thumb or wrist. He is able to make a composite fist with the remainder of his hand. He has full sensation throughout the hand, there is good distal pulses and brisk capillary refill. There is minimal pain to palpation. General appearance findings show the patient to be oriented to person, place, and time, well developed, well nourished and in no acute distress patient does not appear to be depressed.

(R. 360.)  PA-C Roiger recommended that Plaintiff wear the splint full-time and not take it off for range of motion activities, although he could take it off to wash his hands.  (R. 360.)

Plaintiff returned to see Dr. Forseth on May 17, 2021.  (R. 358.)  Plaintiff noted he was having some cramping-type pain in his forearm and that the splint was a bit uncomfortable in his mid-forearm as well, but he had no numbness or tingling.  (R. 358.)  Plaintiff reported "no psychological symptoms, feeling anxious and feeling depressed," along with trouble sleeping (but was not feeling tired).  (R. 358.)  Dr. Forseth wrote:

> Examination of the right hand demonstrates nicely healed incisions. No signs of infection. Thumb CMC joint is stable. Mild tenderness throughout the forearm. There is full sensation noted in bilateral hands in the median, radial, and ulnar nerve distribution. No motor deficits, no atrophy. There is a palpable radial pulse bilaterally and brisk capillary refill throughout. No overlying skin changes are seen, no erythema, no ecchymosis, no swelling.

(R. 358.)  He planned for Plaintiff to remain in his splint for another couple of weeks before starting to work on his range of motion; for his splint to be repaired and possibly modified around the mid-forearm area; and for therapy to start that involved soft tissue massage of the forearm, tendon glides, etc.  (R. 358.)  Plaintiff's splint was modified later that day by Ben Gailfus, OTR/L.  (R. 357.)

26

Plaintiff returned to Summit Orthopedics for occupational therapy on May 25, 2021, and was seen by Timothy J. Richtsmeier, OTR/L. (R. 354.) In his wrist, Plaintiff had: a flexion active range of motion ("AROM") of 90 degrees; an extension AROM of 85 degrees; an ulnar deviation AROM of 20 degrees; a radial deviation AROM of 5 degrees; a proration AROM of 85 degrees; and a supination AROM of 80 degrees. (R. 354.) As to his hand and digits, Plaintiff showed: a limited thumb range of motion at his right MCP[32] joint; a right MCP flexion AROM of 60 degrees; a right IP flexion AROM of 70 degrees; a right palmar abduction AROM of 45 degrees; and a right radial abduction AROM of 45 degrees. (R. 354.) OTR/L Richtsmeier also wrote:

> Thumb to P1 of RSF. 7wks post op. Pain 7/10 described as sharp. Intermittent numbness and tingling in median nerve distribution with neural tension noted. Scar nicely healed without sensitivity. Mod to severe pain with palpation to thenar region. ROM guarded secondary to pain. Maintain FA Thumb spica for stability of thumb.

(R. 354.)

Plaintiff completed 20 minutes of therapeutic exercise and 15 minutes of fluidotherapy. (R. 354.) OTR/L Richtsmeier indicated that Plaintiff's rehabilitation potential was good. (R. 355.) Plaintiff's long-term goals included improved range of motion in order to remove the splint in eight weeks; strengthening that would allow him to complete all home and work tasks within eight weeks; and reporting a pain level of no more than 2/10 while improving function over that same period. (R. 355.) OTR/L

---

[32] The MCP, or metacarpophalangeal, joint forms one's knuckles. Lauren Okafor, et al., Anatomy, Shoulder and Upper Limb, Hand Metacarpal Phalangeal Joint (Oct. 24, 2023), https://www.ncbi.nlm.nih.gov/books/NBK538343 (last visited Mar. 27, 2025).

Richtsmeier planned for Plaintiff to return for additional appointments at least six to eight times with a frequency of one to two times a week.  (R. 355.)  Plaintiff's prescriptions at the time were meclizine[33]; methocarbamol, metoprolol tartrate; ondansetron; and Senexon-S.  (R. 355-56.)

Plaintiff was seen by Dr. Forseth on June 7, 2021.  (R. 352.)  Plaintiff was experiencing some MP joint instability and was "somewhat symptomatic," but had no numbness or tingling.  (R. 352.)  His thumb CMC joint was stable.  (R. 352.)  Dr. Forseth noted "[t]herapy was working on his hand, not so much the forearm."  (R. 352.)  Dr. Forseth observed that the incisions were nicely healed with no signs of infection; Plaintiff had some tenderness in his forearm, but was negative Tinel's and Phalen's in his hand and negative Tinel's and elbow flexion test in his elbow; Plaintiff had full sensation in his hands, no motor deficits and no atrophy; his pulse and capillary refill were palpable; and he had no swelling.  (R. 352.)  Plaintiff reported signs of anxiety but no depression.  (R. 352.)  Dr. Forseth changed Plaintiff's forearm-based splint to a hand-based splint for the MP joint mostly in hopes of stabilizing it.  (R. 352.)  OTR/L Gailfus issued Plaintiff such an updated splint that day.  (R. 351.)

Plaintiff was seen by OTR/L Gailfus for occupational therapy on June 18, 2021, and complained of having quite a bit of pain through the soft tissue in his right arm.  (R. 349.)  He reported functional limitations in dressing and undressing; feeding, eating, and

---

[33]    Meclizine is a medication used to treat nausea and vomiting caused by motion sickness.  Meclizine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682548.html (last visited Mar. 27, 2025).

drinking; leisure; sleep; and fine motor tasks, gripping, job performance, lifting, pushing/pulling, reaching, and tool use. (R. 349.) The results of Plaintiff's range of motion tests were identical to those at his May 25, 2021 appointment. (R. 349; *see* R. 354.) Plaintiff completed 30 minutes of manual therapy, 15 minutes of which were fluidotherapy. (R. 349.) OTR/L Gailfus anticipated the following treatment for future visits: manual therapy, modalities, therapeutic exercise, therapeutic activities, self-care/home management, home program, and orthotics management. (R. 350.) He believed Plaintiff showed good rehabilitation potential. (R. 349.) Plaintiff was to return an additional six to eight times with a frequency of one to two appointments a week. (R. 350.)

Plaintiff again participated in occupational therapy with OTR/L Gailfus on June 25, 2021. (R. 347.) Plaintiff's functional limitation reports, range of motion, and treatment were the same as during the June 18, 2021 visit. (R. 347; *see* R. 349.) In addition, Plaintiff reported that he could feel the pain all the way into his shoulder. (R. 347.)

On July 28, 2021, Plaintiff presented at the M Health Fairview Hand Therapy clinic for an initial evaluation by Jennifer Johnson, OT. (R. 431.) Plaintiff had symptoms of thumb instability and forearm soft issue tightness. (R. 433.) Plaintiff reported pain, stiffness/loss of motion, weakness/loss of strength, and edema in his hand, but noted his symptoms were gradually getting better. (R. 431, 433.) However, Plaintiff reported that keeping his right hand wide open was "excruciatingly painful." (R. 431.) When resting, Plaintiff had a "buzzing" pain most often in his forearm, lateral arm, and in

the CMC joint area, but with use the pain was up to 8-9/10, stopping him, and would hurt for several hours.  (R. 432.)  OT Johnson observed no edema.  (R. 432.)  Plaintiff described the pain as aching and sharp, intermittent, worst during daytime or nighttime, exacerbated by centering clay on a pottery wheel, and relieved by rest.  (R. 432.)  He indicated that his pain was not improving.  (R. 432.)  However, Plaintiff also stated that he was doing limited PCA work, doing wheel ceramics daily, and playing disc golf.  (R. 432.)  OT Johnson observed that Plaintiff's CMC joint was "quite unstable" and had "a bit of a hollow shape."  (R. 432.)  Plaintiff completed a pinch test that resulted in 75 for grip; 6.5 in his CMC joint and 14 in his IP and MP joints in the lateral pinch; and 7 and 15 on the IP and MP joints in the three-part pinch.  (R. 433.)  OT Johnson thought that Plaintiff had an excellent rehabilitation potential and believed Plaintiff could benefit from occupational therapy to increase his range of motion and decrease pain.  (R. 433.)  The plan indicated that Plaintiff would be seen twice a week for three weeks, before tapering to once a week for four weeks.  (R. 433.)

At an appointment regarding foot pain on August 6, 2021, Plaintiff reported to Dr. Adekola that he had compromised right thumb surgical hardware which had been causing instability in his right thumb and increased pain, and both shoulders had pain that was worsening.  (R. 670-71.)

Plaintiff returned to see OT Johnson on September 2, 2021 for his thumb pain.  (R. 427-28.)  He reported the same "buzzing" background pain that increased to 8 or 9 out of 10 when in use.  (R. 428.)  OT Johnson wrote that Plaintiff was doing limited PCA work, wheel ceramics daily, and his own car work when he could, and was also playing disc

golf.  (R. 428.)  OT Johnson noted that Plaintiff had improved self-management of his symptoms and concluded that he was ready to be discharged and would continue a home treatment program.  (R. 429-30.)

On September 29, 2021, Plaintiff presented to Twin Cities Orthopedic Urgent Care for evaluation of his leg.  (R. 395.)  Troy Evenson, PA listed Plaintiff's medications as the following: belbuca; chlorhexidine gluconate[34]; clindamycin[35]; cozaar[36]; gabapentin; hydroxyzine; losartan potassium; meclizine; meloxicam[37]; methocarbamol; metoprolol tartrate; Neurontin;[38] oxycodone; oxycodone-acetaminophen; rizatriptan benzoate; Toprol; and tramadol.  (R. 397.)

On November 11, 2021, Plaintiff had an intake call to establish care with the Associated Clinic of Psychology ("ACP"), speaking to Millicent Holmstrom, MS-PAS,

---

[34]    Chlorhexidine is used to treat gingivitis.  Chlorhexidine (oral route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/chlorhexidine-oral-route/description/drg-20068551 (last visited Mar. 27, 2025).

[35]    Clindamycin is an antibiotic.  Clindamycin, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682399.html (last visited Mar. 27, 2025).

[36]    Cozaar is a brand name for losartan.  Losartan (Oral Route), Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/losartan-oral-route/description/drg-20067341 (last visited Mar. 27, 2025); *see* footnote 9.

[37]    Meloxicam is a pain reliever used to treat arthritis.  Meloxicam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601242.html (last visited Mar. 27, 2025).

[38]    Neurontin is a brand name for Gabapentin.  Gabapentin is approved to prevent and control partial seizures, relieve postherpetic neuralgia after shingles and moderate-to-severe restless legs syndrome.  Gabapentin, Cleveland Clinic (July 1, 2021), https://my.clevelandclinic.org/health/drugs/21561-gabapentin (last visited Mar. 27, 2025).

PA-C.  (R. 925.)  Plaintiff reported that he had a lot of pain, had undergone multiple surgeries, and was seeing a pain therapist.  (R. 925.)  He reported struggling with insomnia and anxiety and taking gabapentin and melatonin daily.  (R. 925.)  Plaintiff stated that since April 2021, he had not been able to stop being anxious and depressed, describing it as "survival mode."  (R. 925.)  Plaintiff told PA-C Holmstrom that he would like to see a therapist rather than trying medication.  (R. 925.)  His issues were described as follows: quality as ongoing, severity as continuous, duration as ongoing, and timing as severe.  (R. 925.)  PA-C Holmstrom noted Plaintiff's past psychiatric history as genetic disease, anxiety, depression, and insomnia.  (R. 925.)  PA-C Holmstrom observed that Plaintiff had a stable mood, as well as good concentration, thought content attention, and fund of knowledge.  (R. 926.)  Plaintiff reported that he had experienced suicidal thoughts on and off in the past but was self-aware, and noted that cyclobenzaprine[39] in the past caused suicidal thoughts.  Plaintiff scored a 3 on a PHQ-9 assessment, indicating no to minimal issues with depression (and which he stated caused him no difficulty at all), but a score of 15 on his GAD-7, indicating severe anxiety (which he asserted caused him extreme difficulty).  (R. 926.)  PA-C Holmstrom noted Plaintiff was positive for mild depression and severe general anxiety.  (R. 926.)  Holmstrom diagnosed him with generalized anxiety disorder and insomnia.  (R. 926-27.)

Plaintiff was seen by Dr. Adekola on January 25, 2022 for lower back, right thumb, right ankle, left foot, and right shoulder pain.  (R. 1007, 1010.)  Plaintiff said his

---

[39]    Cyclobenzaprine is a muscle relaxant.  Cyclobenzaprine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682514.html (last visited Mar. 27, 2025).

pain level was 6/10 and his physical activity level was unchanged.  (R. 1008.)  The appointment notes also incorporated notes from a December 27, 2021 visit with Dr. Adekola stating that Plaintiff had tapered off gabapentin and was then planning to speak to a psychologist for his PTSD.  (R. 1008.)

On January 26, 2022, Plaintiff was seen by Joseph Toth, MSW, LICSW, at the ACP.  (R. 917.)  Toth noted the Plaintiff's reason for seeking mental health services: "[Plaintiff] described having significant anxiety symptoms and that he was struggling with a genetic physical condition that was causing mental and emotional distress. [Plaintiff] described having debilitating anxiety and that he was struggling with psychological distress."  (R. 918.)  Plaintiff reported that his symptoms had started "[s]everal years ago," he experienced them three to five times a week, and concluded, "I am always anxious, mostly about my health."  (R. 918.)  However, Plaintiff stated he had never received any mental health treatment prior to that appointment and took no medications for his mental health.  (R. 919.)  Plaintiff completed a PHQ-9 and a GAD-7, scoring a 10 on the PHQ-9, indicating moderate depression, and a 13 in the GAD-7, indicating moderate anxiety.  (R. 917.)

Plaintiff also spoke to the functional impairment his conditions caused him.  (R. 921-22.)  Of note, he claimed a severe problem with his occupational/vocational functioning ("I have a fear of working. I have a fear my illness will prevent me from working."), a severe problem with his educational functioning ("In the past it was a problem"), a severe problem with his social/interpersonal/marital functioning ("I have problems [sic] in the past"), and a mild/slight problem with his independent living

capacity/self-care functioning.  (R. 921-22.)  Plaintiff also took a World Health

Organization Disability Assessment Schedule ("WHODAS 2.0")[40] screening, in which he

noted an extreme difficulty with being emotionally affected by his health problems; a

severe difficulty in learning a new task and doing his day-to-day work; a moderate

difficulty in taking care of his household responsibilities, maintaining a friendship, and

joining in community activities; a mild difficulty concentrating on something for 10

minutes; and no difficulty washing his whole body, getting dressed, or dealing with

people he does not know.  (R. 922-23.)  Confusingly, Plaintiff reported that he

experienced these difficulties 10 of the last 30 days; was totally unable to carry out his

usual activities 25 of the last 30 days; and that, not counting the days that he was totally

unable, the issues caused him to cut back or reduce his usual activities 12 of the past 30

days.  (R. 923.)

> Toth provided the following summary of the visit:
>
> The client is 41 year old male that reported having a history of anxiety and
> that he is experiencing more psychological distress and more challenges with
> somatic complaints and fear of "genetic debilitating illness". [sic] The client
> explained that he has been having more challenges with mental distress and
> insomnia. The client denied having thoughts of self-harm and he denied
> having a history of attempted suicide, but that he has low mood as a result of
> his "physical illness". [sic] The client explained that he was diagnosed with
> a genetic disorder several years ago and that "unpredictable illness" often
> prevents him from being more productive. The client reported that he has had
> "many surgeries". [sic] The client denied substance abuse, but he reported
> having a childhood history of behavioral issues. The client denied being

---

[40]    The WHODAS is a "generic assessment instrument" to measure health and
disability.  *See* WHO Disability Assessment Schedule 2.0 (WHODAS 2.0), World Health
Org., https://www.who.int/standards/classifications/international-classification-of-
functioning-disability-and-health/who-disability-assessment-schedule (last visited Mar.
27, 2025).

hospitalized for severe mental health issues and he reported being happily married for 20 years. The client reported symptoms consistent with GAD and the client endorsed having anxiety regarding his health. The client reported that he is having more anxiety and that that his anxiety often negatively impacts daily functioning. The client explained that he fears returning to work in "construction" as his physical illness will Impact his ability to perform work duties. The client reported being stable but that he is having more challenges with mental health stressors and physical illness.

(R. 923.)  Toth diagnosed Plaintiff with GAD, insomnia disorder, and mood disorder due to known physiological condition, unspecified.  (R. 923.)

Dr. Adekola saw Plaintiff again on February 24, 2022 for his chronic pain, at which time he indicated that the pain in his right thumb had worsened.  (R. 1002-03.) Plaintiff also expressed that he believed the two surgeries on his thumb had failed.  (R. 1003.)

Plaintiff was seen by Dr. March on March 8, 2022 for a follow-up cardiology visit. (R. 932.)  Dr. March wrote: "Since I last saw him, he has been doing well.  He continues to do pottery as well as work as a personal assistant.  He likes playing disc golf.  He has not been as active since [C]ovid and has gained 15 pounds but is working on it."  (R. 932.)  She noted that Plaintiff was married and lived with his wife.  (R. 933.)  His review of systems was negative for psychiatry.  (R. 934.)  Dr. March assessed Plaintiff with depression/anxiety and planned to refer him to psychology, noting "he had a bad experience with another psychologist in the past year not within UM."  (R. 935.)

In a March 15, 2022 visit to Dr. Adekola, Plaintiff indicated that his joint pain was worse due to the weather and estimated it was at a 4/10 on the pain scale despite an

unchanged activity level.  (R. 996-97.)  Dr. Adekola continued Plaintiff on Percocet and gabapentin.  (R. 1001.)

Plaintiff returned to see Dr. Forseth on April 7, 2022 for reevaluation of his right arm and wrist.  (R. 1028.)  Plaintiff complained of pain over his pisiform bone[41] and some pain over his CMC joint.  (R. 1028.)  While his CMC joint was uncomfortable, Plaintiff stated it was better than it was before the operations.  (R. 1028.)  Dr. Forseth observed some tenderness over his CMC joint and pisiform and positional carpal joint with some crepitance, but Plaintiff had full sensation, no motor deficits or atrophy, pulse and capillary refill, and no swelling.  (R. 1028.)  Plaintiff stated that he was still active in doing pottery and ceramics.  (R. 1028.)  X-rays were taken that showed no fractures or dislocations but some early arthritic changes in his pisiform triquetral joint.  (R. 1028.)  Dr. Forseth also noted that Plaintiff was feeling anxious and depressed and was having trouble sleeping.  (R. 1028.)

On April 28, 2022, Plaintiff was treated by Lealand Torgerson, PA-C.  (R. 1083.)  Plaintiff came in complaining of forearm pain and swelling.  (R. 1083.)  PA-C Torgerson noted: "Patient was doing yard work yesterday all day from 11 AM until 7 PM last night, snapping branches, preparing firewood without breaks.  This was 2nd consecutive day of performing extensive yard work."  (R. 1083.)  While he had forearm pain, he denied pain

---

[41]     The pisiform bone is a bone in the wrist.  Kelsey M Kjosness et al., The Pisiform Growth Plate is Lost in Humans and Supports a Role for Hox in Growth Plate Formation (Oct. 3, 2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4292754 (last visited Mar. 27, 2025).

in his fingers and hand and registered a grade 5 grip strength.[42]  (R. 1083.)  There is no mention of any mental health concern.  PA-C Torgerson recommended that Plaintiff follow-up with Dr. Forseth the next week.  (R. 1083.)

Plaintiff was seen by Dr. Forseth on May 9, 2022.  (R. 1081-82.)  Plaintiff was being seen for left forearm pain that began after doing a lot of yard work, specifically snapping branches from a tree he and his neighbor tore down.  (R. 1081.)  Plaintiff had some swelling, crepitance, and maximal tenderness in the intersection area, but had a full range of motion, no numbness or tingling, and no motor deficits or atrophy.  (R. 1081.)  X-rays of the area came back negative for bone injuries nor any arthritic changes.  (R. 1081.)  Dr. Forseth wrote that his presentation and examination were "fairly classic for intersection syndrome."[43]  (R. 1081.)  Dr. Forseth gave Plaintiff a cortisone injection.  (R. 1081.)  Plaintiff "report[ed] no other musculoskeletal" complaints, and Dr. Forseth did not note any mental health concerns.  (R. 1081.)

Plaintiff had a telehealth visit with the Pain Center on May 11, 2022 with chief complaints of arm pain in the left forearm beginning 2 weeks prior, shoulder pain, back pain, and right hand pain.  (R. 1289.)  His pain score was 4/10 with unchanged physical

---

[42]    Muscle strength is graded from 1 to 5, with 1 being no muscle activation and 5 being "[m]uscle activation against examiner's full resistance" with a full range of motion. Muscle Strength Grading, Nat'l Lib. of Med. (Aug. 28, 2023), https://www.ncbi.nlm.nih.gov/books/NBK436008 (last visited Mar. 27, 2025).

[43]    Intersection syndrome is pain between the wrist and hand caused by repetitive friction. *See* Nicholas Michols & John Kiel, Intersection Syndrome (Aug. 5, 2021), https://www.ncbi.nlm.nih.gov/books/NBK430899/#:~:text=Introduction,over%20the%20 second%2C%20creating%20tenosynovitis (last visited Mar. 27, 2025).

activity, he reported taking Percocet, Robaxin, and gabapentin, which he felt was helpful in alleviating the pain, and was seeking a refill of Percocet. (R. 1289.) He was alert and cooperative, with a normal affect, attention span, and conversation. (R. 1291.) He was in no apparent distress and was alert and oriented times three. (R. 1291.) It was recommended that he follow up with his orthopedic surgeon, as he reported that his right thumb surgeries had failed, and that he continue with his hand therapy. (R. 1293.) It was noted that he had completed pain therapy with Dr. Lexau. (R. 1293.)

At an office visit with PA-C Hammer on June 16, 2022 for ankle pain, Plaintiff reported PTSD and persistent nightmares. (R. 1285.) He also reported that he had met with a psychiatrist at ACP, but "did not like or connect with providers." (R. 1285.) On examination, his attention, perception, mood, affect, and speech were normal. (R. 1286.) His behavior was normal and cooperative. (R. 1286.) His thought content was coherent, his cognition and memory were normal, and his judgment was normal. (R. 1286.) PA-C Hammer referred him to North Memorial psychiatry. (R. 1287.)

Plaintiff had a telehealth visit with the Pain Center on June 30, 2022 with chief complaints of foot and ankle pain. (R. 1280.) His pain score was 6/10 with unchanged physical activity. (R. 1280.) He was alert and cooperative, with a normal affect, attention span, and conversation. (R. 1282.) He was in no apparent distress and was alert and oriented times three. (R. 1282.) The recommendation to follow up with his orthopedic surgeon remained the same. (R. 1284.)

Plaintiff had a telehealth visit with the Pain Center on August 30, 2022. (R. 1269.) His chief complaints were foot pain and ankle pain, but he also reported some neck pain

due to "possible strain," which was somewhat improved after he saw a chiropractor. (R. 1269.) His pain score was 6/10 with unchanged activity, and the Pain Center planned to set him up with cupping again. (R. 1269.) He was alert and cooperative, with a normal affect, attention span, and conversation. (R. 1271.) He was in no apparent distress and was alert and oriented times three. (R. 1271.)

On September 7, 2022, Plaintiff presented at the North Memorial emergency department for dizziness after injuring his neck while "working under a car changing the entire fluids" about two weeks earlier "when he had acute onset left-sided neck pain" and "felt a 'pop.'" (R. 1254.) His symptoms had gotten progressively worse, he had seen a chiropractor three days before presenting to the ER, and he was now reporting dizziness, vertigo, nausea, and some clumsiness of his left hand. (R. 1254.) An MRI was negative. (R. 1258-59.)

Plaintiff had a virtual visit with the Pain Center on October 24, 2022, during which he reported minimal improvement in his neck pain and that he had strained his calf "while playing golf frisbee a few weeks ago." (R. 1248.) He was alert and cooperative, with a normal affect, attention span, and conversation. (R. 1250.) He was in no apparent distress and was alert and oriented times three. (R. 1250.)

On October 31, 2022, Plaintiff had a virtual visit with Allysa S. Jacobson, APRN, CNP, at North Memorial Health Mental Health Services Center. (R. 1247.) CNP Jacobson noted that Plaintiff thought that the appointment was for therapy and he was not interested in taking medication. (R. 1247.) She referred him to therapy. (R. 1247.)

On November 16, 2022, Plaintiff was seen by PA-C Hammer for an annual routine preventative health exam.  (R. 1239.)  Plaintiff wanted to discuss a follow-up with "TCO" (presumably Twin Cities Orthopedics) and he was struggling with his calf.  (R. 1239.)  PA-C Hammer noted that Plaintiff was suffering from chronic pain with an increase in depression symptoms and struggling to connect with a therapist.  (R. 1242.)  She wrote:

> Mental health, worse, met with psychiatrist thought he was meeting with therapist, wants therapy for PTSD, symptoms have worsened. Pain is affecting his mood more, frustrated that he has not been able to connect with new therapist. Not interested in medication. Support in friends, spouse. Has very sad thoughts, denies thoughts of self harm.

(R. 1243.)  A PHQ-9 screening reported a 13, indicating moderate depression.  (R. 1243.)  He showed normal attention and mood and coherent thought content, with cooperative behavior and normal judgment.  (R. 1243.)  PA-C Hammer also described Plaintiff as alert, oriented, pleasant, and comfortable.  (R. 1242.)

Plaintiff saw Jessica Kaster, PHD, LP for psychotherapy on December 1, 2022.  (R. 1236.)  His reason for being seen was that he "presents with symptoms of depression, chronic pain" and he "report[ed] symptoms are impairing occupational, social, and personal functioning."  (R. 1236.)  He was well-groomed, pleasant, and cooperative, and oriented to place, time, and situation.  (R. 1237.)  His mood was dysthymic and his affect was congruent with the situation.  (R. 1237.)  His speech was normal, his thought content and process were appropriate, and his cognition and concentration were normal.  (R. 1237.)  The plan was: "Continue telehealth contacts, 1:1 individual therapy using a CBT, problem solving, ACT modalities."  (R. 1237.)

Plaintiff had another visit with Dr. Kaster by telehealth on December 8, 2022.  (R. 1233.)  Plaintiff was primarily focused on his physical pain and pain treatment issues, reporting changes in pain management and physical therapy providers.  (R. 1233.)  His reason for being seen was "anxiety, health concerns," and he said that his symptoms were impairing occupational, social, and personal functioning.  (R. 1233.)  Plaintiff was well-groomed, pleasant, and cooperative, and oriented to place, time, and situation.  (R. 1234.)  His mood was euthymic and his affect was congruent with the situation.  (R. 1234.)  His speech was normal, his thought content and process were appropriate, and his cognition/concentration was normal.  (R. 1234.)  The plan remained the same.  (R. 1234.)

Plaintiff saw Dr. Kaster for psychotherapy on December 15, 2022, with anxiety as his reason for being seen, and he reported that his symptoms were impairing his occupational, social, and personal functioning.  (R. 1228.)  The only change in his mental status exam from his December 8, 2022 visit was a dysthymic (rather than euthymic) mood.  (R. 1229.)  Plaintiff reported that he continued to experience anxiety and depression related to health conditions and limitations due to chronic pain.  (R. 1230.)  Plaintiff reported having impairing symptoms most days.  (R. 1232.)  Dr. Kaster anticipated Plaintiff's treatment would last three months.  (R. 1232.)

Plaintiff saw Dr. Kaster again on December 29, 2022 with depression as his reason for being seen.  (R. 1225.)  He reported that his symptoms were impairing his occupational, social, and personal functioning.  (R. 1225.)  Plaintiff was wondering about trying medication and a "SAD light," given a decrease in his mood.  (R. 1225.)  He planned to speak with his primary care provider about those options.  (R. 1225.)  Plaintiff

stated that he was not finding enjoyment in doing art and was feeling more "down" and "apathetic." (R. 1226.) However, he was still playing disc golf, even in the snow, and had put his kiln back together. (R. 1225.) His mood was dysthymic but otherwise his mental status exam unchanged from his December 15, 2022 results. (R. 1226.)

Plaintiff visited Dr. Kaster again on January 5, 2023 for "symptoms of depression, pain." (R. 1222.) Plaintiff reported that his symptoms were impairing his occupational, social, and personal functioning. (R. 1222.) Plaintiff spoke about increased pain due to snow blowing and roof raking due to a "huge snow earlier this week," even though he knew it was "not a good idea because of his health limitations."[44] (R. 1222.) He had also helped his neighbors with clearing snow. (R. 1222.) He mentioned that his "disability court hearing" was coming up and was "thinking of writing short stories" and wondered about the best way to do so, "as writing is not an option due to physical limitations." (R. 1222.) His mental status exam was the same as on December 15, 2022. (R. 1223.) His treatment plan remained unchanged. (R. 1223.)

Plaintiff saw Dr. Kaster on January 12, 2023 for depression and pain that he said were impairing his occupational, social, and personal functioning. (R. 1219-20.) He was disappointed that his disability case had been "continued in court." (R. 1219.) His mood

---

[44]     Plaintiff attended physical therapy from October 24, 2022 until January 18, 2023 for his back pain. (R. 1086-1152.) During a November 14, 2022, Plaintiff told the provider that he had been shoveling heavy snow earlier that day. (R. 1136.) On December 20, 2022, he did "admit he probably has been doing too much with snow removal." (R. 1107.)

was euthymic and mental status exam results were otherwise unchanged from earlier sessions.  (R. 1220.)

On January 19, 2023, Plaintiff had a psychotherapy session with Dr. Kaster with "depression" identified as the reason, at which he reported his symptoms were impairing his occupational, social, and personal functioning.  (R. 1186.)  Plaintiff did not discuss his depression or anxiety, rather he raised his pain due to a kidney stone and neck pain, which was affecting his sleep, and anger issues.  (R. 1186.)  Plaintiff was well-groomed, pleasant, and cooperative, and oriented to place, time, and situation.  (R. 1187.)  His mood was dysthymic and his affect was congruent with the situation.  (R. 1187.)  His speech was normal, his thought content and process were appropriate, and his cognition/concentration was normal.  (R. 1187.)  The plan remained the same.  (R. 1187.)

Plaintiff saw Dr. Kaster for psychotherapy on February 2, 2023, the specific reasons being depression and anxiety that continued to impair his occupational, social, and personal functioning.  (R. 1304.)  He had broken both lower bones in his right leg playing frisbee golf outside.  (R. 1304.)  Plaintiff discussed incidents where he woke up during surgery and how to overcome that experience.  (R. 1304.)  Dr. Kaster notes Plaintiff had been dealing with a broken leg but "[r]emains relatively positive."  (R. 1305.)  His mood was euthymic and his mental status exam otherwise the same as January 19, 2023.  (R. 1305.)

Plaintiff saw Dr. Kaster for psychotherapy on February 16, 2023.  (R. 1301.)  He hoped to continue to work on issues related to his fears of surgery and to explore his tendency not to value himself, but was generally ok.  (R. 1301.)  He reported that he was

43

"getting better at dealing with having a lack of control in his life" and "working on letting things go." (R. 1301.) His mood was dysthymic, but his mental status was otherwise unchanged from February 2, 2023, that is, otherwise normal. (R. 1302.)

## B.    Plaintiff's Reports and Third-Party Evidence

### 1.    Plaintiff's Reports

Plaintiff filled out a Disability Report – Adult on January 18, 2022. (R. 237-49.) He listed his medical conditions as Loeys-Dietz Syndrome; arthritis; neuroma in left foot; failed surgeries in right hand/thumb; and severe anxiety from waking up during surgery. (R. 238.) He listed his medications as ibuprofen, losartan, methocarbamol, metoprolol, oxycodone-acetaminophen (Percocet), and rizatriptan. (R. 240-41.) He did not list a provider for mental health services, only noting that PA-C Hammer made referrals for his mental health. (R. 244-45.) He also did not make any note of mental health issues in the "remarks" section of the report. (R. 249.)

Plaintiff completed a Function Report – Adult on January 28, 2022 ("January 2022 Function Report"). (R. 258-65.) In the section asking for information about how his illness, injuries, or conditions limited his ability to work, Plaintiff listed issues arising from his joint instability but no limitations arising from any mental health issues. (R. 258.) He described his daily routine as getting up, taking pain medication, showering, "whatever housework I can manage," showering (again), taking pain medication, and going to bed. (R. 259.) He stated that he can no longer work full time, exercise, or do most household chores. (R. 258.) He reported insomnia and rarely getting more than three hours of unbroken sleep. (R. 259.) He reported difficulty with buttons and that it

44

was painful to pull a shirt over his head when dressing; for bathing, he stated his wife has to help him clean himself; he reported no issues with hair care; for shaving, he wrote his hands were unsteady; he reported no issues feeding himself; and he reported limitations when using the toilet, specifically that his right wrist subluxates when wiping.  (R. 259.) He stated that he needed no reminders to take care of his personal needs and did not need help or reminders to take his medicine.  (R. 260.)

Plaintiff stated that he would prepare his own meals, making mostly sandwiches, but would need help preparing anything large like a ham or soup.  (R. 260.)  Plaintiff stated that he mowed the lawn "on good days," which would take an hour, and removed snow (although he reported that neighbors sometimes helped), and completed minor home repairs.  (R. 260.)  He said he got outside "rarely" in the winter but "as much as possible" in the summer.  (R. 261.)  He reported going out by walking, driving, and riding in a car.  (R. 261.)  He was able to go out alone and drive.  (R. 261.)  Plaintiff reported shopping in stores, by mail, and by computer for groceries and materials monthly, taking a couple of hours.  (R. 261.)  He managed his own finances.  (R. 261.)

Plaintiff's interests and hobbies were "ceramics and disc golf," where he did ceramics multiple times a week and played disc golf as weather permitted.  (R. 262.)  He did report that his impairments limited how long he could work with clay and play disc golf, and also changed how he threw the discs.  (R. 262.)  Plaintiff reported being social in person and via text and playing board games or disc golf with other people, often in the winter and as much as possible in the summer.  (R. 262.)  He reported going to the doctor's office monthly for tests, which he could do alone.  (R. 262.)  He was no longer

able to play "real sports," such as volleyball, football, or baseball, due to his limitations. (R. 262.)

He listed the following as affected by his impairments: lifting; squatting; bending; standing; reaching; walking; sitting; kneeling; stair climbing; completing tasks; and using hands. (R. 263.) He attributed these issues to "unstable joints, arthritis in my neck, back, hands, shoulders, ankles." (R. 263.) His ability to walk depended on the day and surface. (R. 263.)

Plaintiff reported that he did not finish what he started but stated that he could follow either spoken or written instructions "very well." (R. 263.) He described his ability to get along with authority figures as "[p]assably," noting he was once fired by an employer who said he had "a bad attitude" but that a subsequent investigation found in his favor. (R. 263.) In response to a question about his ability to handle stress, he wrote, "No very anymore [sic]" but could handle changes in routine "[f]ine." (R. 264.) He reported "surgical anxiety." (R. 264.) As for medications, he listed losartan, metoprolol, oxycodone, and methocarbamol. (R. 265.)

Dr. March partially filled out a Cardiac Residual Functional Capacity Questionnaire in March 2023. (R. 1312.) Dr. March left the questionnaire mostly blank, but did write that Plaintiff "should not lift more than 10 lbs" and that he was limited by his "muscular skeletal [sic] joint dislocations from his Loeys Dietz and chronic pain." (R. 1316.)

Plaintiff filled out another Disability Report – Adult on April 12, 2022. (R. 268-75.) He described deterioration in his wrist and hand ("i [sic] have had 2 surgeries on this

hand already"), and knee.  (R. 269.)  He asked "no" in response to the question "do you have any **NEW** physical or mental conditions."  (R. 269.)  He did not list a mental health provider.  (*See* R. 269-71.)  He described worsening physical symptoms, but nothing about mental health.  (*See* R. 272-74.)

On May 11, 2022, Plaintiff completed another Function Report – Adult ("May 2022 Function Report"), raising similar concerns as the January 2022 Function Report. (R. 278-85.)  He noted increased joint instability including foot drop, hand drop, random weakness, and severe joint pain.  (R. 278.)  He had "[i]nfrequent, very broken sleep."  (R. 269.)  He still was making his own meals, which were still primarily sandwiches, and was doing yardwork and other chores, but did "very little above the level of my shoulder" and did the rest of the chores because "I have to."  (R. 280.)  Yardwork took most of the day and chores took hours.  (R. 280.)  Plaintiff reported that he got outside "almost daily" in warm weather and traveled by car, which he could do alone.  (R. 281.)  He shopped in stores for groceries every two to three weeks.  (R. 281.)  He again noted doing ceramics and playing disc golf.  (R. 282.)  He also reported playing disc golf and cards with others on a weekly basis and going to public parks 2-3 times a week.  (R. 282.)

Plaintiff listed the following restrictions: lifting; squatting; standing; reaching; walking; sitting; kneeling; and using his hands, but no longer indicated any restriction in bending or completing tasks.  (R. 283; *compare* R. 263 (indicating issues bending and completing tasks).)  Plaintiff did not indicate that he had problems with his concentration or getting along with others.  (R. 283.)  Plaintiff indicated that his ability to finish what he started depended on the day and task but still reported following written or spoken

instructions "well." (R. 283.) He also reported that he got along "well" with authority figures and had never been fired due to issues getting along with other people—which is different from his answer of "[p]assably" and report of termination due to an employer's belief that he had a "bad attitude" in his January 2022 Function Report. (R. 283; *compare* R. 263.) In response to a question about how well he handles stress, Plaintiff answered: "Poorly, [l]ittle to no patience." (R. 284.) He reported handling changes in routine "well." (R. 284.) Plaintiff also reported "more frequent nightmares." (R. 284.) He listed his prescriptions as gabapentin and Percocet. (R. 285.)

### 2. PA-C Hammer's Evidence

On November 18, 2022, PA-C Hammer completed a Physical Residual Function Capacity Questionnaire ("November 18, 2022 Physical RFC") and wrote a letter regarding her care and Plaintiff's symptoms on the same day ("November 18, 2022 letter"). (R. 1066-71 (November 18, 2022 Physical RFC); R. 1072-73 (November 18, 2022 letter).) PA-C Hammer stated that Plaintiff had significant physical difficulties relating to standing, sitting, lifting, bending, and using his hands and fingers. (R. 1066-71.) PA-C Hammer opined that Plaintiff would need to take a break during work every 30 to 60 minutes for 5 to 10 minutes. (R. 1069.) She opined that Plaintiff could not lift or carry any items, even those that weigh less than 10 pounds. (R. 1070.) She opined that Plaintiff could continuously sit for 20 minutes at a time and continuously stand for 5 minutes at a time. (R. 1068.) She opined that Plaintiff could sit, stand, and walk less than 2 hours in an 8-hour work day with normal breaks. (R. 1068.) She opined that Plaintiff would need to walk for 5-10 minutes every 10 minutes and would need to shift

from sitting, standing, and walking at will.  (R. 1069.)  PA-C Hammer opined that

Plaintiff would need to take an unscheduled break every 30-60 minutes during an 8-hour

work day, resting for 5-10 minutes each time.  (R. 1069.)  She further opined that

Plaintiff might "potentially" need to elevate his legs during prolonged sitting, depending

on his level of pain, at about 60-90 degrees.  (R. 1069.)  At a sedentary job, she opined

that Plaintiff's legs should be elevated 50% of the time.  (R. 1070.)

When asked about Plaintiff's ability to use his hands, fingers, and arms, PA-C

Hammer answered that he had no ability to use his right hand to grasp, turn, or twist

objects; no ability to use his fingers to do fine manipulations; and no ability to use either

arm to reach.  (R. 1070.)  PA-C Hammer also wrote that Plaintiff would be expected to

have good days and bad days, and that his impairments would require him to be absent

from work more than four times a month.  (R. 1071.)

PA-C Hammer also gave her opinion as to the effect of Plaintiff's mental health on

his limitations, stating that depression and PTSD contributed.  (R. 1067.)  She did not

think Plaintiff was a malingerer.  (R. 1067.)  She opined that his pain and other symptoms

would interfere with his attention and concentration frequently (to 75% of the day) and

that stress would be difficult for him to handle in part due to his "depressed mood."  (R.

1067-68.)  PA-C Hammer noted that Plaintiff had a "mood disorder with recent increase

in depression due to increase in joint and muscle pain."  (R. 1071.)  She concluded that

Plaintiff could complete low stress jobs.  (R. 1068.)

In PA-C Hammer provided a summary of Plaintiff's physical and mental ailments

in the November 18, 2022 letter.  (R. 1072-73.)  PA-C Hammer wrote:

Regarding request for physical residual functional capacity questionnaire completion. In regard to patient #5. [sic] Brock has significant pain in multiple joints including his neck, wrist, hand, thumb, knee, calf, ankle, foot at this time. He has had pain in other joints during other periods of time. He does have Loeys-Dietz syndrome which causes hypermobility of multiple joints which can result in dislocations and frequently and significant pain, arthritis, dysfunction. He has had multiple surgeries including shoulder surgery, ankle, hand surgery. He has suffered dislocations of multiple joints in his body. When dislocation occurs he has severe pain and significant impact on his function. He does follow with a pain specialist and takes multiple medications to help control his pain which do have side effects which include sedation, constipation, impaired reflexes, nausea, dizziness, which affect his ability to function. He also has worsening depression due to his chronic pain which has affected his ability to complete his activities of daily living and participate in activities that he enjoys and to work outside the home.

The clinical findings on exam are variable depending on which joints are affected. Currently he does have pain over his cervical spine and neck musculature, over his calf, ankle and foot. Although his pain is chronic in nature it can affect different joints more severely at different times depending on his level of activity and if he suffers a dislocation.

He has participated in multiple treatment modalities which do include surgeries, physical therapy, acupuncture, cupping which have had varying effects on his level of pain. He has been an active participant and has been compliant with all recommendations, despite this he continues to have pain on a daily basis that affects his mood and his ability to function. He is seen by multiple specialists including orthopedists at Twin Cities orthopedics and Summit orthopedics, North Memorial chronic pain center, physical therapy, Fairview cardiology.

(R. 1072.)

On March 13, 2023, Plaintiff submitted an undated Medical Assessment of Ability to do Work-Related Activities (Mental) ("Spring 2023 Mental Assessment") completed by PA-C Hammer.  (R. 1317 (letter to ALJ) (counsel noting that the mental function report is undated and that he was attempting to get it dated); R. 1318-21 ("Spring 2023 Mental Assessment").)  Relating to his ability to make occupational adjustments, PA-C

Hammer indicated that Plaintiff had unlimited or very good ability in following the rules, relating to co-workers, using judgment, and interacting with supervisors; a good ability to deal with the public; a fair ability to deal with work stresses and function independently; and a poor or no ability to maintain attention and concentration.  (R. 1319.)  PA-C Hammer noted "(pain)" next to the "maintain attention/concentration" section.  (R. 1319.) She elaborated that "pain affects concentration, mood, ability to handle stressful situations."  (R. 1319.)  Relating to making performance adjustments, PA-C Hammer indicated that Plaintiff has an unlimited or very good ability to understand, remember and carry out simple job instructions; a good ability to understand, remember and carry out detailed, but not complex job instructions; and a fair ability to understand, remember and carry out complex job instructions.  (R. 1319.)  PA-C Hammer elaborated that "pain impacts ability to focus, comprehend complete complex tasks, multi step process."  (R. 1320.)

Relating to his ability to make personal-social adjustments, PA-C Hammer opined that Plaintiff had an unlimited or very good ability to maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations; and a fair ability to demonstrate reliability, further stating, "pain will impact reliability."  (R. 1320.)  PA-C Hammer estimated that Plaintiff would have to miss work more than three times a month due to these impairments.  (R. 1321.)

### 3.    Dr. O'Regan's Report

On May 31, 2022, Plaintiff underwent a mental status evaluation via video conference with consulting examiner John O'Regan, PhD.  (R. 1032-37.)  Dr. O'Regan

noted Plaintiff's reports of nightmares due to the potential of his shoulders becoming dislocated due to his LDS and after his heart surgery. (R. 1033.) Plaintiff reported having "little tolerance" for surgery after past procedures and becoming anxious when surgery happened. (R. 1033.) He also reported increased migraines and a history of ADHD. (R. 1033.) Dr. O'Regan also summarized Plaintiff's history of present illness:

> The client reports that he has always struggled with his attention, particularly as a child. He was prescribed Ritalin because he had difficulty staying on tasks, was losing things, was disorganized, and was hyperactive.

> The client reports that he sleeps fitfully because he worries much. He believes he is worrying more often recently. He used to get 5 hours of good sleep when he was a teenager, but now wakes up every 2 hours because he is tense and worried about his medical situation.

> He also wonders whether he has higher level autism because he believes that he is "on the spectrum" with difficulty interacting with people. He likes to go outside, but he gets frustrated with people bothering him or leaving cigarettes or pop cans around because he likes to play disc golf alone and not be disturbed by his surroundings. He does ceramics, but everything in his life needs to be balanced or he becomes upset with that asymmetry. He gives an example of the wiring in his house that he did "perfectly."

> The client believes that he had 2 panic attacks in his life, involving shortness of breath and graying or spotting in his vision. He has not suffered one for quite some period of time.

> The client reports that he has become increasingly irritable and is on the "verge of tears a lot." This is especially so over the past 2 years. He feels like a failure as person for not working. His concentration, sleep, and energy level are not good. He denies thoughts of hurting himself, but does not feel productive.

> The client reports that he woke up in surgery at least once or twice. He sat up in surgery 12 times recently; the surgery was painful because he was given less pain medication because he was not supposed to wake up. He is now anxious about having a surgery. When he becomes anxious, his heart "flutters."

The client tried counseling once this past winter, but felt that psychologist was not sympathetic. He has never been psychiatrically hospitalized. He is taking albuterol, gabapentin, losartan, methocarbamol, metoprolol, oxycodone-acetaminophen, rizatriptan, and prescribed medical marijuana, although he has not purchased it.

The client recalls that he was bullied in school because he was the only the Jehovah Witness in a fundamentalistic school. He relates that he was beaten up so bad that his ribs were cracked. He was in special education in the 9th or 10th because of issues with ADHD. He did manage to graduate on time and later took some college level courses. He never finished a program.

The client is currently working as a respite worker, averaging 20 hours over 2 weeks. Before that, he mostly did construction work, but believes that that work is no longer feasible for him, because it is dangerous for him and others due to his physical limitations.

(R. 1034.)

In summarizing the evidence of record, Dr. O'Regan only highlighted the April 13, 2021 diagnostic assessment completed when Plaintiff saw Dr. Lexau at North Memorial Hospital, which diagnosed him with GAD and major depressive disorder, recurrent, mild. (R. 1034-35; *see* R. 685-92 (April 12, 2021 diagnostic assessment with Dr. Lexau).) Dr. O'Regan noted that that the assessment noted that Plaintiff had problems with social cues and was hyperorganized, and also questioned whether Plaintiff had autism spectrum disorder. (R. 1035.) Dr. O'Regan also noted that Plaintiff has a history of panic attacks. (R. 1035.)

Plaintiff also provided an overview of his daily functioning to Dr. O'Regan. Plaintiff stated that he shared cooking responsibilities with his wife, was able to load and unload the washing machine and dryer but could not fold clothes, did not vacuum but would mow the lawn, and did the shopping with help because he had difficulty walking

and lifting objects.  (R. 1035.)  Plaintiff noted some physical difficulties washing himself but otherwise had no trouble with hygiene.  (R. 1035.)  His daily activities involved watching TV, reading, maybe walking, and working on ceramics.  (R. 1035.)  Plaintiff would try to go to bed between 10 p.m. and 1 a.m. but his brain will not "slow down," reducing the amount of sleep he used to get from 5 hours to waking up every hour throughout the night.  (R. 1035.)

Dr. O'Regan conducted a mental status exam of Plaintiff.  Dr. O'Regan observed Plaintiff to have clear, coherent, relevant, and goal-directed thoughts, with no evidence of hallucinations, delusions, obsessions, or paranoia.  (R. 1035.)  Plaintiff was in touch with reality and oriented to time, person and place.  (R. 1035.)  Dr. O'Regan noted that Plaintiff's affective tone was one of mild-to-moderate dysphoria.  (R. 1035.)  Plaintiff had an average attention span, recalling six digits forward and four digits in reverse.  (R. 1035.)  For concentration, he calculated serial 3s six times forwards without error and did two correct calculations of serial 7s backwards.  (R. 1036.)  He also spelled "world" correctly forwards and backwards.  (R. 1036.)  For memory, Plaintiff recalled three of three objects immediately and three of three objects after five and 50 minutes, and knew his address, date of birth, age, and the current President and his predecessor.  (R. 1036.)  Plaintiff knew about a national news event, abstractly interpreted a simple proverb, showed good judgment, had good insight into his illness, and had an average intellectual level based on his vocabulary and fund of information.  (R. 1036.)  Dr. O'Regan found no evidence of a personality disorder or somatic symptom disorder.  (R. 1036.)

O'Regan provided the following summary and diagnostic impression:

> The client has been diagnosed with Loeys-Dietz syndrome, causing painful dislocation of his shoulders. He believes that this syndrome has severely limits what he can do in his life. The client grew up struggling with ADHD and was prescribed Ritalin at one time. He was in special education in 9th and 10th grade shortly after this diagnosis. He was bullied in school and physically assaulted. He is now a chronically anxious individual, who has a higher level of autism spectrum disorder, with social reciprocity and interaction issues. He has a history of 2 panic attacks, but has not had one recently. He is a chronically depressed individual, who has had recent traumas in surgery leading to night terrors and an abnormal fear of blood.

(R. 1036.)  He diagnosed Plaintiff with ADHD; GAD with history of panic attacks; major depressive disorder, moderate; PTSD, moderate; and night terrors and blood phobia.  (R. 1036.)  Dr. O'Regan gave Plaintiff a fair prognosis.  (R. 1036.)

In conclusion, Dr. O'Regan provided the following Medical Sources Statement:

> Based on his current social and emotional functioning, he has the mental capacity to understand, remember, and follow simple and complex instructions. His capacity to sustain attention and concentration is moderately impaired as a result of his severe medical conditions, further exacerbated by his corresponding mood disorder. Thus, he would be challenged to carry out work-life tasks with reasonable pace or persistence. He would not have any difficulty responding appropriately to brief and superficial contact with co-workers, supervisors, and the public. It is this examiner's opinion that he would be able to tolerate the stress and pressure typically found in an entry-level workplace.

(R. 1037.)

### 4.    Dr. Kaster's Opinion[45]

On December 15, 2022, Dr. Kaster completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on Plaintiff's behalf, indicating the assessment was

---

[45]    Plaintiff did not argue in his brief that the ALJ erred with respect to Dr. Kaster's opinion, and the Court therefore does not discuss that opinion further.  *Cf. Henningsen v. Astrue*, No. CIV. 11-2693 PJS/JSM, 2013 WL 791771, at *9 n.6 (D. Minn. Feb. 13,

appliable for one year.  (R. 1307-10.)  As to Plaintiff's ability to make occupational adjustments, Dr. Kaster opined that he had an unlimited or very good ability to follow work rules, use judgment, and function independently; good ability to deal with work stresses; fair ability to relate to co-workers, interact with supervisors, and maintain attention/concentration; and between fair and no ability to deal with the public.  (R. 1308.)  Dr. Kaster wrote, however, that Plaintiff would be limited by the weather, his pain level, and the presence of pain medication, and that his chronic pain would affect his mood and productivity.  (R. 1308.)

For his ability to make performance adjustments, Dr. Kaster opined that Plaintiff had an unlimited or very good ability to understand, remember and carry out simple job instructions; a good ability to understand, remember and carry out detailed, but not complex job instructions; and a fair ability to understand, remember and carry out complex job instructions.  (R. 1308.)  She wrote that the presence of pain would make following directions difficult and also difficult to predict.  (R. 1309.)  Finally, in making personal social adjustments, Dr. Kaster indicated that Plaintiff had an unlimited or very good ability to maintain his personal appearance; a good ability to behave in an

---

2013) ("Henningsen did not ascribe any error to the ALJ on the basis of this condition. Any claim regarding this impairments [sic] is waived."), *R. & R. adopted*, No. CIV. 2013 WL 791620 (D. Minn. Mar. 4, 2013); *see also Terry v. Arnett*, No. 22-2849, 2023 WL 1773880, at *1 (8th Cir. Feb. 6, 2023) ("Terry waived his challenge to the authenticity of the video by failing to raise the issue before the magistrate judge . . . .") (citing *Dusseldorp v. Cont'l Cas. Co.*, 951 F.3d 981, 985 (8th Cir. 2020)); *Maesse v. Colvin*, No. CIV. 12-2993 DWF/FLN, 2014 WL 1017961, at *3 (D. Minn. Mar. 14, 2014) ("Plaintiff objects to the ALJ's reliance on the vocational expert's testimony regarding the availability of these jobs in the regional economy.  But her memorandum does not discuss this issue at all, and she thus appears to waive it.").

emotionally stable manner and demonstrate reliability; and a fair ability to relate predictably in a social situation. (R. 1309.) She also wrote that Plaintiff's irritability and ability to maintain a filter were impacted by his pain, causing him to be "too direct," which could be unprofessional. (R. 1309.) Dr. Kaster also stated that Plaintiff would need to call in sick to work when in pain, but while that was unpredictable, it would cause at least three or more absences from work a month. (R. 1309-10.) She opined that Plaintiff was able to manage his own finances. (R. 1310.)

## C.   Hearing Testimony

### 1.   Plaintiff's Testimony

On direct examination during the hearing before the ALJ, Plaintiff testified about his physical symptoms, specifically his issues with joint subluxation, foot drop, and his heart issues. (R. 49-59.) Plaintiff also testified about his problems with his fingers dislocating, noting that his pinkies and thumbs were "pretty bad." (R. 53.) Plaintiff testified that fine motor skill activities would cause his fingers to dislocate (but usually his thumb) about three to four times a week. (R. 53.) He also testified that his thumbs have a lot of cracking, grinding, and pain. (R. 57.) Plaintiff testified that when a dislocation in his fingers happen, the pain is so severe that he cannot concentrate or focus on anything else until it subsides. (R. 53-55.) His testimony was very similar in response to a question about whether he could concentrate or focus when experiencing tachycardia, replying: "Not particularly. I lose my train of thought pretty quickly." (R. 57-58.) He further testified: "When I'm doing that [having irregular heartbeats], it's hard to focus mentally, but also, it's hard to focus even my eyes because everything is

vibrating so fast. I end up having a hard time concentrating on anything because my entire body is vibrating." (R. 58.)

As to his mental health, Plaintiff testified that he had problems with anxiety and depression due to his medical problems and he feared going out in public because someone may bump him and cause a dislocation. (R. 59.) Plaintiff highlighted this concern in the wintertime due to snow and ice. (R. 59.) More generally, he testified: "I'm -- have very little tolerance I try and stay with what's comfortable for me and that's with everything, whether it's people, games, food. I'm -- nothing new really is on my plate right now." (R. 59.) When asked how he experiences depression, Plaintiff answered:

> Lack of sleep, my mind races and races and races, nightmares, I'm not able to complete tasks that should be very simple for me. My concentration is almost nonexistent right now. You mentioned earlier that I do pottery. Most of the pottery I do is muscle memory. I shouldn't really even need to think about it to do it. The forms that I do are very simple and they're the ones that I've learned how to do and I can't even do those right now, not reliably.

(R. 59-60.)

As to his physical limitations, Plaintiff testified that he could stand up to 10-20 minutes on a "good day" and less than five minutes on a "bad day." (R. 61.) According to Plaintiff, on a good day, he had the ability to walk up to a block and a half to two blocks on a hard surface and could go a bit farther on a soft surface, but would need frequent breaks. (R. 61.) On a bad day, he does not walk. (R. 61.) He predicted he could sit upright in a chair for about five minutes before having to fidget and move due to back pain. (R. 61-62.) Plaintiff testified that on a good day, he could lift and carry a

gallon of milk but not on a bad day.  (R. 62.)  Plaintiff stated that he has good days less than half of days.  (R. 62.)

### 2.    The VE's Testimony

Vocational Expert ("VE") Mary Harris testified at the hearing before the ALJ as set forth below.

> Q So, I'd like your assistance in classifying the claimant's work doing PCA and respite care and then maybe the satellite installer position that the claimant did back in 2008 and '09.

> A Okay. One moment. Okay. Bring it up here. Okay. I'm sorry, Judge. Still -- okay. All right. With the satellite installer would be under DOT 821.281 010. This is skilled with an SVP of 5 and heavy both as performed and per DOT. And then we have the personal care attendant, which would encompass both the respite care as well under DOT 354.377-014, semi-skilled, SVP of 3, medium per the DOT and it sounds like that may have varied between light to heavy.

> Q And assuming an individual with those two past occupations with at least a high school education under the age of 50, let me pose a few hypotheticals related to that. If you assumed an individual that could occasionally lift or carry 20 pounds and frequently 10 [sic] that would be limited to standing or walking 2 hours out of a typical workday who would be limited to frequent reaching and handling, that would preclude those past occupations. Is that correct?

> A That is correct, Judge.

> Q Are there other occupations that such an individual could perform that you're familiar with?

> A Judge, I would find this hypothetical sitting, the job of -- one moment, office helper. And that DOT is 239.567-010, unskilled, SVP of 2 and light with estimated job numbers at 88,000 in the national economy. There would also be inspector/hand packager, DOT 559.687-074, unskilled, SVP of 2 and light with estimated job numbers at 80,000 in the national economy. And then, Judge, there would be electrical assembly under DOT 729.687-010, unskilled, SVP of 2 and light with estimated job numbers at 85,000 in the national economy.

Q Have you seen those three occupations performed?

A Yes.

Q And those positions are all going to require frequent reaching and handling. Is that correct?

A Yes, they are.

Q Individual limited to occasional reaching and handling, would that -- would there be any other entry level occupations that you're familiar with that would be otherwise compatible to hypothetical [sic]?

A No, Your Honor.

Q And no transferable skills from the claimant's past work to any occupations consistent with the hypothetical?

A No.

Q And in terms of being off task from one's position, so if one had to stop work in order to address physical symptoms, just not able to work for a period of time, how much of that do you believe might be permitted in competitive work?

A Judge, that averages [sic], but no more than 10% of the workday off task would be permitted.

(R. 66-68.)

## III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding.

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (cleaned up).

"This court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (citation omitted and cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)). The record is viewed in the light most favorable to the agency's determination. *Chismarich*, 888 F.3d at 980.

## IV.    DISCUSSION

Plaintiff makes three challenges to the ALJ's decision. First, Plaintiff challenges the ALJ's determination that Plaintiff's mental health impairments were nonsevere. (Dkt. 9 at 8-10.) Second, Plaintiff argues that the ALJ should have included limitations related to his mental health impairments and right-hand gross manipulation and fine finger movements in his RFC. (*Id.* at 8, 10-16.) Third, Plaintiff contends the ALJ erred at step five by failing to include mental limitations in the hypothetical question posed to the VE

61

and failed to resolve an alleged inconsistency between the VE's testimony, his restriction regarding time-on-feet, and the occupations that the ALJ found Plaintiff could perform. (*Id.* at 8, 16-17.)

## A.     Severity of Plaintiff's Mental Health Impairments

The Court starts with Plaintiff's challenge to the ALJ's determination that his mental health impairments (anxiety and depression) were not severe.  (Dkt. 9 at 9-10.)  At the second step of the five-step analysis, the ALJ considers "the medical severity of [a claimant's] impairment(s)."  20 C.F.R. § 404.1520(a)(4)(ii).  It is a claimant's burden to demonstrate a severe medically determinable impairment or combination of impairments at step two of the sequential evaluation.  *See Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (citations omitted).  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id.* at 707 (citation omitted); *see* 20 C.F.R. § 404.1520(c).  The severity showing "is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  *Kirby*, 500 F.3d at 708 (citations omitted).

Plaintiff relies on his own testimony regarding his memory, concentration, and ability to complete tasks and Dr. O'Regan's opinions as evidence that his mental impairments have "more than a minimal impact on his ability to engage in work activities.  (Dkt. 9 at 9.)  Plaintiff also suggests that the ALJ erred in relying on his course of conservative treatment because "the ALJ fails to explain why a conservative course of treatment equates to support for a conclusion that [Plaintiff's] mental impairments have

no more than a minimal effect on his ability to maintain attention, concentration and persistence and pace." (*Id.* at 9-10.)

The Court begins with Plaintiff's challenge to how the ALJ treated his testimony regarding his mental health symptoms. When evaluating statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims, the Social Security Administration ("SSA") "examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *4 (Soc. Sec. Mar. 16, 2016). This evaluation includes consideration of the following factors: "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *see* 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *7. The ALJ also considers whether there are inconsistencies between the claimant's statements and the rest of the medical evidence, only accepting those statements that can "reasonably be accepted as consistent" with the rest of the record in making its RFC determination. 20 C.F.R. § 416.929(c)(4).

"SSR 16-3p became effective on March 28, 2016." *Barbara M. v. Saul*, No. 18-CV-1749 (TNL), 2019 WL 4740093, at *7 n.9 (D. Minn. Sept. 27, 2019). "[SSR] 16-3p

eliminates use of the term 'credibility' and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole." *Lawrence v. Saul*, 970 F.3d 989, 995 n.6 (8th Cir. 2020). SSR 16-3p "largely changes terminology rather than the substantive analysis to be applied."[46] *Id.*

"[C]aselaw is clear the ALJ is not required to discuss each factor." *Michlitsch v. Berryhill*, No. 17-CV-3470 (MJD/TNL), 2018 WL 3150267, at *15 (D. Minn. June 12, 2018) (citing *Bryant*, 861 F.3d at 782; *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)), *R. & R. adopted*, 2018 WL 3150225 (D. Minn. June 27, 2018). Instead, the ALJ must only "minimally articulate his reasons for crediting or rejecting evidence of disability." *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). "Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.") (quotation omitted).

---

[46]    Because the substantive analysis of subjective complaints has not changed, the Court continues to cite cases that use the term "credibility."

Here, the ALJ considered Plaintiff's reports of "severe anxiety from waking up during surgery" and reports of "anxiousness, worry, irritability, panic, decreased sleep and concentration, and social interaction issues due to autism" during the consultative examination with Dr. O'Regan, but found they were inconsistent with Plaintiff's "largely conservative" course of mental health treatment, "largely unremarkable" mental status examinations (including during psychotherapy), the absence of any "stepped-up services" such as hospitalization, day treatment, or more intensive therapy, and Plaintiff's activities of daily living, including as reported to Dr. O'Regan.  (R. 22-23.)

The Court first addresses Plaintiff's argument that the ALJ erred in relying on his course of mental health treatment.  An ALJ can consider a claimant's conservative course of treatment in determining if their actions are disabling.  *See Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Here, Plaintiff was never prescribed any medication to treat depression or anxiety, attended outpatient therapy sessions for a relatively brief period of time, and never sought or was recommended more intensive therapy or other mental health treatment, such as hospitalization.  The Court finds the ALJ's characterization of Plaintiff's course of mental health treatment as "largely conservative" and decision to discount Plaintiff's subjective complaints supported by substantial evidence and consistent with Eighth Circuit law.  *See Jennifer G. v. Kijakazi*, No. 20-CV-1197 (LIB), 2021 WL 6231437, at *8 (D. Minn. Sept. 29, 2021) (affirming ALJ's decision to discount subjective complaints relating to mental health based partly on the fact that plaintiff had "not had any psychiatric hospitalizations, has never been brought to the emergency room

for an acute mental health exacerbations or panic attacks, [and] has never been referred for partial hospitalizations or a day treatment").

Similarly, the ALJ relied on Plaintiff's self-reported activities of daily living when discounting his subjective complaints relating to anxiety and depression. (R. 23.) The ALJ described these activities as "part-time work, some cooking, grocery shopping, lawn mowing, reading on his tablet, watching television, working on ceramics in the studio, and generally attending to his own care with some manipulative limitations." (R. 23 (citing Dr. O'Regan's report (R. 1033-37)).) Plaintiff does not dispute this description of his activities of daily living, and the record is replete with his references to him engaging in such activities—including in his January 2022 and May 2022 Function Reports. (*See, e.g.*, R. 432, 436, 428, 932, 1248, 1225, 1304 (playing frisbee golf); R. 260-62 (January 2022 Function Report describing cooking, mowing the yard, minor home repairs, snow removal, shopping for groceries, driving on his own, managing money, engaging in ceramics, and playing board games and disc golf); R. 280-82 (May 2022 Function Report stating the same except playing cards instead of board games).) Further, Plaintiff reported in May 2022 that he followed written and spoken instructions "well" and did not have issues getting along with authority figures. (R. 283.) As of September 7, 2022, he was mentally able to change the fluids a car. (R. 1254.) Plaintiff has not identified anything that calls into question the ALJ's reliance on these (apparently undisputed) activities of daily living.

Finally, the ALJ relied on Plaintiff's "largely unremarkable" mental status exams. R. 22.) Plaintiff does not appear to challenge this statement, and based on the Court's

review of the record, while Plaintiff occasionally had a dysthymic or depressed mood and reported anxiety, his mental status exams never showed anything more serious. Rather, as discussed in detail in Section II, Plaintiff was repeatedly described as having normal attention, conversation, cognition, memory, and concentration, among other normal findings. There is no error, legal or otherwise, in the ALJ's reliance on these mental status exams when discounting Plaintiff's testimony regarding his anxiety and depression. *See Melanee B. v. Kijakazi*, No. 20-CV-1179 (ECW), 2021 WL 4199333, at *20-21 (D. Minn. Sept. 15, 2021) (affirming finding that plaintiff's PTSD, anxiety, and depression were nonsevere despite "her reports of anxiety and depression; observations of a sad, depressed, tearful, and anxious affect at times; and her PTSD diagnoses" based on her otherwise "normal or relatively normal mental status" exams).

The Court turns to Plaintiff's challenge to the ALJ's treatment of Dr. O'Regan's opinions. The regulations set forth how an ALJ should determine the weight assigned to each medical opinion. *See* 20 C.F.R. § 404.1520c(a). For claims filed after 2017: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). When a medical source provides one or more medical opinions or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment and frequency of examinations, among other factors), (4) specialization, and (5) other factors

(for example, when a medical source has familiarity with the other evidence in the claim).

20 C.F.R. § 404.1520c(a), (c)(1)-(5).

> The SSA further states:
>
> The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2).

> The SSA has described supportability and consistency as follows:
>
> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

"Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and

nonmedical sources in the claim."  Revisions to Rules, 82 Fed. Reg. at 5,844-01, 5,853;

*see also* 20 C.F.R. § 404.1520c(c)(2).  "An ALJ's discussion of [a medical source's]

treatment and examination notes reflects the ALJ's consideration of the supportability

factor with respect to their opinions."  *Stephanie B. v. Kijakazi*, No. CV 22-837

(JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023) (citation omitted).  An

ALJ's discussion of the record when discussing consistency similarly shows

consideration of that factor.  *See Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL

4540107, at *11 (D. Minn. Sept. 28, 2022) (discussing supportability and consistency and

explaining "the ALJ's conclusion regarding the consistency factor—like the

supportability factor—must be read in the context of the decision in its entirety").

The ALJ found Dr. O'Regan's opinions "not persuasive" for four reasons.  First,

Dr. O'Regan's opinions relied heavily on Plaintiff's self-reported symptoms.  (R. 23.)

Second, Dr. O'Regan considered Plaintiff's physical impairments and symptoms in

drawing his conclusion, which "are not in the purview of Dr. O'Regan's expertise."  (R.

23.)  Third, Dr. O'Regan used "ambiguous terms," such as "challenged," which lack a

clear definition and "has no vocational relevancy."  (R. 23.)  And fourth, the ALJ found

that Dr. O'Regan's findings and conclusions were not supported by Plaintiff's "very

minimal and conservative treatment" at the time he met with Dr. O'Regan.  (R. 23.)

Plaintiff does not appear to challenge the ALJ's decision to discount Dr.

O'Regan's opinions to the extent they related to physical impairments and symptoms

beyond Dr. O'Regan's expertise as a psychologist or were "ambiguous" and without

"vocational relevancy."  In any event, the ALJ does not have to credit a medical

provider's opinion if it strays beyond her expertise. *See Zachary J. E. v. Kijakazi*, No. 22-CV-101 (TNL), 2023 WL 2572229, at *11 (D. Minn. Mar. 20, 2023) (finding no error in ALJ's decision to discount medical opinion regarding the claimant's "abilities to maintain attention and concentration" of doctor who treated the claimant for diabetic peripheral neuropathy because they were "outside his area of expertise"); *cf.* 20 C.F.R. § 404.1520c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."). Similarly, an ALJ need not credit opinions given in terms that do not have a clear meaning in the vocational context. *See Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996) (finding medical opinion "of limited value due to its vagueness" where: "Dr. Schultz's opinion of Piepgras's condition consists of vague, conclusory statements. In three short letters submitted to the judge, Dr. Schultz stated that Piepgras has had 'an extremely difficult time managing his diabetes' because he cannot maintain the proper diet. Dr. Schultz also stated that because of this difficulty in controlling his diabetes, Piepgras has had 'great difficulty' in keeping a job. Dr. Schultz did not explain what he meant by 'extremely difficult' and 'great difficulty' in his letters and he did not testify at Piepgras's hearings.").

The Court turns to the other two reasons the ALJ discounted Dr. O'Regan's opinions: because they were not supported by Dr. O'Regan's "limited findings on mental status examination" and inconsistent with Plaintiff's course of treatment. As to Dr.

O'Regan's findings, he observed Plaintiff to have clear, coherent, relevant, and goal-directed thoughts, with no evidence of hallucinations, delusions, obsessions, or paranoia. (R. 1035.) Plaintiff was in touch with reality and oriented to time, person and place, although his affective tone was one of mild-to-moderate dysphoria. (R. 1035.) Plaintiff had an average attention span, recalling six digits forward and four digits in reverse. (R. 1035.) For concentration, he calculated serial 3s six times forwards without error and did two correct calculations of serial 7s backwards. (R. 1036.) He also spelled "world" correctly forwards and backwards. (R. 1036.) For memory, Plaintiff recalled three of three objects immediately and three of three objects after five and 50 minutes, and knew his address, date of birth, age, and the current President and his predecessor. (R. 1036.) Plaintiff knew about a national news event, abstractly interpreted a simple proverb, showed good judgment, had good insight into his illness, and had an average intellectual level based on his vocabulary and fund of information. (R. 1036.) Substantial evidence supports the ALJ's decision to discount Dr. O'Regan's opinions as inconsistent with these mental status findings.

Similarly, as discussed above, Plaintiff's course of mental health treatment was limited and provides a basis for further discounting Dr. O'Regan's opinions as inconsistent with the record. Plaintiff saw Dr. Kaster regularly for outpatient therapy between December 1, 2022 and February 16, 2023, a period of about three months. (*See* R. 1236, R. 1301.) He appears to have seen Dr. Lexau twice, on May 30, 2021 and April 13, 2021, later reporting in March 2022 reporting that his therapy with Dr. Lexau was "completed." (R. 685, R. 696, R. 997.) In fact, Dr. Lexau's assessment of Plaintiff on

April 13, 2021—which Dr. O'Regan discussed in his opinion—included mental status exam results which were overwhelmingly normal, including appropriate mood and affect, good insight, adequate judgment, normal memory and concentration, and estimated "average to high average" intellectual functioning.  (R. 691.)

Finally, when setting forth his Paragraph B findings, the ALJ acknowledged Dr. O'Regan's opinions as to these criteria.  (R. 23-24.)  When the ALJ disagreed with Dr. O'Regan's opinion, he explained why.  (*See, e.g.*, R. 24 (finding Dr. O'Regan's limitation of brief and superficial contact with others unsupported by the record, which showed Plaintiff had maintained a long-term marital relationship, was working as a PCA, and could shop in stores); R. 24 (rejecting Dr. O'Regan's statement that Plaintiff "would be 'challenged' to carry out work-like tasks with reasonable persistence and pace" because no mental status exams showed problems with attention and concentration, Plaintiff had "relatively good activities of daily living," and had "been able to engage in parttime [sic] work as a personal care attendant (PCA), does pottery and ceramics, plays disc gold [sic], performs household chores and yard work, and reported doing some auto mechanic work"); R. 24-25 (finding only mild limitation in ability to adapt or manage oneself based on "relatively good activities of daily living," "largely unremarkable" mental status exams, and because Plaintiff had "been able to engage in part-time work, attends to his own care, has stable housing and a good marital relationship, has hobbies, has had no period of decompensation, and has not sought stepped-up mental health services since onset").)  Plaintiff has not challenged any aspect of the ALJ's Paragraph B

analysis, much less shown any part of the analysis is unsupported by substantial evidence.

In sum, while Plaintiff disagrees with the ALJ's treatment of Dr. O'Regan's opinion, Plaintiff does not identify any error in the ALJ's reasons for discounting it. The Court concludes that substantial evidence supports the ALJ's decision to discount Dr. O'Regan's opinions. *See Loren F. v. Kijakazi*, No. 22-CV-2862 (NEB/ECW), 2023 WL 8456174, at *16 (D. Minn. Nov. 13, 2023) (finding ALJ's decision to discount medical opinions supported by substantial evidence notwithstanding multiple instances where plaintiff's mood was "described as sad, depressed, anxious, irritable, labile, and apathetic, as well as his affect being described as angry [sic] fearful, anxious, depressed, irritable, agitated, and withdrawn" in view of "multiple places in the medical record where Plaintiff is described as having a generally full affect, cooperative behavior, and intact attention, memory, insight, concentration, and judgment," his intact activities of daily living, and where "Plaintiff reported taking college level courses with average performance, starting and maintaining a podcast, volunteering at a radio station, shopping at stores and maintaining his finances independently, and engaging in activities that challenged his mind"); *R. & R. adopted*, No. 22-CV-2862 (NEB/ECW), 2023 WL 8455690 (D. Minn. Dec. 6, 2023).

Further, Plaintiff's self-reported activities of daily living, conservative course of mental health treatment, and generally normal mental status exams—which the Court discussed above in connection with respect to Plaintiff's subjective complaints—constitute substantial evidence to support the ALJ's conclusions that Plaintiff's anxiety

and depression did not constitute severe impairments.  *See Jones v. Callahan*, 122 F.3d 1148, 1153 (8th Cir. 1997) (finding mental impairments nonsevere where the "evidence as a whole failed to establish that Jones's daily activities were restricted due to emotional causes, or that there was a significant deficit in Jones's ability to function socially" and "Jones was not undergoing any regular treatment by a mental health professional nor was he regularly taking medication for emotional symptoms"); *Coons v. O'Malley*, No. 1:23-CV-00113-JSD, 2024 WL 3694130, at *4-6 (E.D. Mo. Aug. 7, 2024) (finding substantial evidence supported an ALJ's decision that the claimant's anxiety and depression were not severe impairments because the claimant's self-reported activities were inconsistent with limitations in concentration and interacting with others and where the consultive examiner's conclusions were inconsistent with the record).  The ALJ's determinations regarding the nonseverity of Plaintiff's mental health impairments do not provide a basis for remand.

**B.    Limitations in Plaintiff's RFC**

Next, Plaintiff argues that the ALJ's RFC finding was not based on substantial evidence because it did not incorporate his mental health limitations and limitations as to his right hand.  (Dkt. 9 at 8, 9-14.)  A disability claimant has the burden to establish her RFC.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the

workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'" *Perks*, 687 F.3d at 1092 (citations omitted) (quoting *Cox*, 495 F.3d at 619-20).

Here, the ALJ determined Plaintiff's RFC as follows:

> to perform sedentary work as defined in 20 CFR 404.1567(a) except: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours and standing and/or walking for 2 hours out of a typical workday; frequent reaching and handling.

(R. 27.)

The Court begins with Plaintiff's argument that: "The ALJ's written decision contains no explanations regarding the opinion of Kerri Hammer, PA-C.  Instead, ALJ Grey expressly states that he refuses to conduct the necessary analysis."  (Dkt. 9 at 12.)  This appears to be an argument that the ALJ made an error of law that requires remand, but it fails for several reasons.

First, Plaintiff has not accurately described what the ALJ wrote in his decision.  The ALJ declined to address PA-C Hammer's **November 18, 2022 letter** at Exhibit No.

12F/8-9 (R. 1072-73), as it did "not include any opinion requiring a persuasiveness articulation." (R. 23.) But, as discussed more below, the ALJ did address PA-C Hammer's **opinions**, described by the ALJ as a "physical medical source statement" and a "mental medical source statement." (R. 33 (citing Exhibit B12F/2-7 (R. 1066-71), Exhibit B23F (R. 1318-21)).)

Second, and setting aside this incorrect description of the ALJ's decision, Plaintiff confuses a "medical opinion" with other "medical evidence." Under the regulations, a "medical opinion" is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in performing work activities, 20 C.F.R. § 404.1513(a)(2), while "other medical evidence" is "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis," 20 C.F.R. § 404.1513(a)(3). Here, PA-C Hammer's November 18, 2022 letter (which is the evidence for which the ALJ provided no persuasiveness explanation) lists Plaintiff's diagnoses, treatment, symptoms, and clinical findings, but does not contain opinions as to what Plaintiff cannot or cannot do or his limitations or restrictions in performing work activities. (R. 1072-73.) Consequently, while that letter may constitute "other medical evidence," it is not a "medical opinion." *See Jared G. v. Kijakazi*, Civil No. 21-1834 (JRT/JFD), 2022 WL 4396474, at *3 (D. Minn. Sept. 23, 2022) ("[T]he central component of a medical opinion under the new regulations is what a claimant can do.") (citing Revisions to Rule Regarding the

Evaluation of Medical Evidence, 2016 WL4764999, 81 Fed. Reg. 62560-01 at *6 (Sept. 9, 2016) ("A more appropriate focus of medical opinions would be perspectives from medical sources about claimants' functional abilities and limitations" rather than claimants' "[d]iagnoses and prognoses" – which "do not describe how an individual functions.")).  The ALJ was required to articulate how he considered a "medical opinion."  20 C.F.R. § 404.1520c(a).  But there is no such requirement for "other medical evidence."  *See Shelton v. Kijakazi*, No. CV 121-154, 2022 WL 3334454, at *4 (S.D. Ga. July 22, 2022) ("The persuasiveness analysis discussed above is only necessary when the opinion rendered constitutes a 'medical opinion' under the regulations, rather than 'other medical evidence.'"), *R. & R. adopted*, 2022 WL 3330148 (S.D. Ga. Aug. 11, 2022).  It was not error for the ALJ to decline to address the persuasiveness of PA-C Hammer's November 18, 2022 letter.

Third, Plaintiff argues that the ALJ did not identify "any medical opinion or other medical evidence" that was inconsistent with PA-C Hammer's opinions.  (Dkt. 9 at 12.)  But the ALJ did discuss PA-C Hammer's **opinions** in detail, including addressing supportability and consistency.  Beginning with PA-C Hammer's November 18, 2022 Physical RFC (R. 1066-71), and relevant to Plaintiff's right-hand challenge, PA-C Hammer opined that Plaintiff would be unable to use his right upper extremity for handling, fingering and reaching.  (R. 1070.)  The ALJ explained as to this opinion:

> The only part of her medical source statement I find persuasive is her opinion as to time on foot, which is consistent with and supported by the record, discussed above, including lower extremity impairments requiring surgical intervention. **Otherwise, I find the remainder of PAC Hammer's medical source statement poorly supported by the record. For examination, she**

**entirely precluding [sic] manipulative activity with the right upper extremity though the claimant is able to work as a PCA, do ceramics and pottery, play disc golf, work on cars, mow his lawn with a push mower, remove snow, and perform other household chores and yard work.** There is also no support in this record for PAC Hammer's opinion as to need for a sit and/or stand option, need for additional breaks and time to walk, need to elevate his legs, and work-preclusive absenteeism. Overall, I find PAC Hammer's medical source statement unpersuasive in assessing the claimant's physical limitations since onset.

(R. 33 (emphasis added).)

Plaintiff makes no argument as to why the ALJ's decision to discount PA-C Hammer's opinion as to his right hand physical limitations is not supported by substantial evidence or did not comply with the regulations. The ALJ explained that he discounted her opinion as to Plaintiff's right hand based on the fact that Plaintiff "is able to work as a PCA, do ceramics and pottery, play disc golf, work on cars, mow his lawn with a push mower, remove snow, and perform other household chores and yard work." (R. 33.) As discussed above, inconsistency with the record, including based on Plaintiff's undisputed activities of daily living, is a basis for discounting a medical opinion. *Ali J. v. O'Malley*, No. 23-CV-910 (KMM/DJF), 2024 WL 3511454, at *6 (D. Minn. May 2, 2024) ("The ALJ similarly explained Dr. Crandall's opinion was inconsistent with the record as a whole, including Plaintiff's history of treatment and medications, mental status examination findings, and reported activities of daily living . . . ."), *R. & R. adopted*, 2024 WL 3509287 (D. Minn. July 23, 2024); *Scott H. v. Saul*, No. 20-CV-847 (HB), 2021 WL 2379420, at *6 (D. Minn. June 10, 2021) ("The ALJ may discount a treating physician's opinion that is inconsistent with the claimant's activities of daily living.") (citing *Crawford v. Colvin*, 809 F.3d 404, 409 (8th Cir. 2015)).

78

Plaintiff appears to rely solely on PA-C Hammer's opinion to support his argument that the RFC should have included additional limitations as to his right hand. (Dkt. 9 at 4, 9, 12-14.)  In any event, the ALJ explained that he accounted for Plaintiff's right-hand impairment in the RFC by "limiting him to no more than frequent handling." (R. 29.)  In doing so, the ALJ summarized Plaintiff's history of right thumb CMC joint pain and procedures, noting that as of April 2022, Plaintiff still had some discomfort, but it was better than it had been before his April 2021 surgery.  (R. 29.)  The ALJ further explained that while Plaintiff still complained of occasional numbness and tingling as well as mild tenderness, he had full sensation in his hand without motor deficits or atrophy.  (R. 29 (citing R. 1028-30).)  As the ALJ noted, Plaintiff had continued doing ceramics, and made no further complaints relating to his right hand.  (R. 29.)  Indeed, Plaintiff was using his hands to do "extensive" yard work in late April or early May 2022, including cutting down a tree, snapping branches, and preparing firewood, but only saw Dr. Forseth for left forearm pain as a result of these activities.  (R. 1081, 1083.) Accordingly, substantial evidence exists in the record as a whole to support the ALJ's determination that Plaintiff should be limited to frequent handling, but did not require the limitations now proposed by Plaintiff.

The Court turns to Plaintiff's argument that the RFC should have included mental limitations.  Plaintiff relies on Dr. O'Regan's and PA-C Hammer's opinions in making this argument.  (Dkt. 9 at 12-14.)

As a starting point, "although an ALJ should consider both severe and non-severe impairments when determining a claimant's RFC, if the record does not support

limitations from the non-severe impairment, the ALJ need not account for the impairment." *David S. v. Saul*, No. 19-CV-1936-ECW, 2020 WL 5255281, at *2 n.1 (D. Minn. Sept. 3, 2020) (citations omitted); *see also Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004) ("The ALJ's decision not to incorporate this mild pulmonary dysfunction in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment.") (footnote omitted). Here, the ALJ considered whether mental limitations should be included in the RFC, including by discussing PA-C Hammer's mental limitations (R. 33) and discussing the finding of no mental impairments at the initial level and only mild impairment as to concentrating, persisting, or maintaining pace and adapting or managing oneself on reconsideration (R. 34).

Beginning with Dr. O'Regan's opinions, Plaintiff argues that "the ALJ gave a conclusory explanation that did not come within a country mile of the analysis required by the Commissioner's regulations." (Dkt. 9 at 13.) On the contrary, and as discussed in Section IV.A, the ALJ gave specific reasons why he discounted Dr. O'Regan's opinions, including because they were inconsistent with the medical record showing normal mental status exam results, not supported by Dr. O'Regan's own mental status exam results, and relied on Plaintiff's subjective complaints regarding his mental health—which the ALJ discounted for reasons supported by substantial evidence. The ALJ's treatment of Dr.

O'Regan's opinion was consistent with the regulations and supported by substantial evidence. [47]

Plaintiff also appears to be relying on PA-C Hammer's opinions as to mental limitations in challenging the RFC. The ALJ acknowledged PA-C Hammer's opinions as to mental limitations in the November 18, 2022 Physical RFC and her opinions in the Spring 2023 Mental Assessment. (R. 33.) The ALJ then explained:

> PAC Hammer's mental limitations are not supported by the claimant's limited and conservative course of treatment, largely unremarkable mental status examination findings, mild self-reported PHQ-9 and GAD-7 scores, and his overall daily functioning, discussed above and below. Again, her opinion as to work-preclusive absence and significant limitation in maintaining attention and concentration is not well explained and poorly supported by treatment and examining records. I find PAC Hammer's medical source statements unpersuasive.

(R. 33.)

"The ALJ's explanation as to persuasiveness does not need to be lengthy." *Stephanie B.*, 2023 WL 3394594, at *1 (quoting *Newman v. Kijakazi*, No. 5:22-59-KKC, 2023 WL 2700700, at *2 (E.D. Ky. Mar. 29, 2023)) (cleaned up). The ALJ sufficiently

---

[47]    When challenging the ALJ's treatment of Dr. O'Regan's opinion as to the RFC, Plaintiff suggests the ALJ erred by relying on his observations of Plaintiff during the March 21, 2023 hearing. (Dkt. 9 at 13 n.1 (quoting R. 31 ("Further, he was able to sit at his hearing without displaying significant pain behavior.")).) The first problem with this argument is that the ALJ was discussing Plaintiff's subjective complaints of back pain, not mental health, when making the challenged statement. (*See* R. 31.) The second problem is that "[w]hile the ALJ's observations cannot be the sole basis of his decision, it is not an error to include his observations as one of several factors." *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008) (citation omitted); *see also Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations.").

explained his consideration of whether PA-C Hammer's mental limitations were consistent with and supported by the medical records and other evidence. Further, for the reasons explained above, the ALJ's decision to discount a medical opinion as to mental limitations based on Plaintiff's course of treatment, activities of daily living, and mental status exams is supported by substantial evidence.

Finally, Plaintiff argues the ALJ failed to build a "logical bridge" as to PA-C Hammer's opinions. (Dkt. 9 at 12-13 (citing *Strom v. Astrue*, Civ. No. 07-150 (DWF/RLE), 2008 WL 2098107, at *9 (D. Minn. Apr. 28, 2008)).) "At minimum," the ALJ must "include a narrative discussion describing how the evidence supports each conclusion." *Nathan L. v. O'Malley*, No. 23-CV-1310 (JWB/DJF), 2024 WL 3015139, at *3 (quoting Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. July 2, 1996)). Here, having reviewed the ALJ's opinion and medical record, the Court has no doubt that the ALJ sufficiently explained what evidence supports his decision to discount PA-C Hammer's mental and physical medical opinions.

## C.    Plaintiff's Step Five Challenges

The Court turns to Plaintiff's step five challenges. Plaintiff first claims that remand is required because the hypothetical question posed to the VE did not include any mental limitations. (Dkt. 9 at 15.) This argument fails because substantial evidence supports the ALJ's decision not to include mental limitations in the RFC, and the hypothetical question need not include limitations that are not part of the RFC. *See Hilkemeyer*, 380 F.3d at 447 ("The ALJ's decision not to incorporate this mild pulmonary

dysfunction in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment.") (footnote omitted); *Kraus v. Saul*, 988 F.3d 1019, 1027 (8th Cir. 2021) ("A hypothetical is not insufficient because it does not include all the health limitations alleged by the claimant."); *Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1050 (D. Minn. 2012) ("Where, as here, a hypothetical question includes all impairments and limitations accepted as true by the ALJ, and is supported by substantial evidence in the record, it provides a proper basis for the ALJ to rely on the VE's response to the hypothetical question.").

The Court turns to Plaintiff's second argument, which is that the ALJ erred by failing to explain an inconsistency between the VE's testimony and the occupations of office helper; inspector, hand packager; and electrical assembly.  (Dkt. 9 at 8-9, 15-17.) Those three occupations are described in the DOT as being performed at a "light" exertional level.  *See* DICOT 239.567-010 (G.P.O.), 1991 WL 672232 (Office Helper); DICOT 559.687-074 (G.P.O.), 1991 WL 683797 (Inspector and Hand Packager); DICOT 729.687-010 (G.P.O.), 1991 WL 679733 (Assembler, Electrical Accessories I). According to the regulations, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983).

Here, the RFC limited Plaintiff to "sedentary work as defined in 20 CFR 404.1567(a)," with an additional limitation of "sitting for 6 hours and standing and/or

walking for 2 hours out of a typical workday." (R. 27.) Plaintiff asserts there is an

"apparent inconsistency" between the RFC limiting Plaintiff to "being on his feet for 2

hours out of an 8-hour day" and the three occupations being performed at a light

exertional level, and that the ALJ "failed to comply with SSR 00-4p" (e.g., failed to elicit

a reasonable explanation for the conflict before relying on the VE's testimony). (Dkt. 9

at 16-17.) Plaintiff further argues that the ALJ erred because "the ALJ did not obtain an

explanation from the vocational witness as to how someone limited to 2 hours on their

feet could perform a job that required 6 hours of standing and/or walking during an 8-

hour day" (*id.* at 17), but does not assert any other basis for why this error is harmful

rather than harmless.

> SSR 00-4p, which governs the use of VE testimony in disability decisions, states:
>
> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and

Other Reliable Occupational Information in Disability Decisions, SSR 00-4p, 2000 WL

1898704, at *4 (Soc. Sec. Dec. 4, 2000)).[48]) Further:

---

[48]    Since the filing of this action, SSA has rescinded SSR 00-4p and replaced it with Titles II and XVI: Use of Occupational Information and Vocational Specialist and

> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

(*Id.*)

According to the Eighth Circuit: "The ALJ was required not only to ask the expert whether there was a conflict, but also to obtain an explanation for any such conflict." *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 & n.7 (9th Cir. 2007) (collecting cases)).  It is error for an ALJ to fail to follow this policy.  *Id.*  However, such error can be harmless, either "were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts."  *Massachi*, 486 F.3d at 1154 n.19; *see also Renfrow*, 496 F.3d at 921 ("In sum, the ALJ's error in failing to ask the vocational expert about possible conflicts between his testimony and the Dictionary of Occupational Titles was harmless, since no such conflict appears to exist.").

---

Vocational Expert Evidence in Disability Determinations and Decisions, SSR 24-3p.  89 FR 97158-01, 2024 WL 5256890 (Soc. Sec. Dec. 6, 2024).  However, SSR 24-3p only applies to actions initiated on or after January 6, 2025.  *See id.* at *2 n.1 ("We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."); *see also Rodriguez v. Comm'r, Soc. Sec. Admin.*, 763 F. App'x 585, 586 n.2 (8th Cir. 2019) (per curium) (unpublished opinion) (applying an earlier SSR because the new one required courts to "us[e] the rules that were in effect at the time" of the ALJ's decision).  Accordingly, because Plaintiff filed this action before January 5, 2025, the Court analyzes this issue using SSR 00-4p.

The Commissioner responds that the RFC, while using the phrase "sedentary work as defined in 20 CFR 404.1567(a)," also permitted Plaintiff to perform lifting 20 pounds occasionally and 10 pounds frequently, which corresponds to light work. (Dkt. 11 at 22-23.) The regulations define "light work" as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The Commissioner concedes that Plaintiff's limitation of standing/walking for only 2 hours corresponds to the definition of sedentary work. (Dkt. 11 at 23.) According to the Commissioner, "Plaintiff was judged able to do sedentary work, and also able to meet the lifting requirements of light work, which led to a nuanced RFC reflecting the ALJ's careful consideration of the record." (*Id.*) Moreover, the Commissioner argues that "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." (Dkt. 11 at 24 (citing *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000).)

Setting aside whether there is an "apparent conflict," the Court considers whether the failure to inquire as to any conflict and obtain an explanation from the VE is harmless. The ALJ asserted in his opinion: "Notably, the vocational expert testified that the above Step-5 jobs are light, but could be performed sitting. (See Hearing Record)." The Court reproduces the relevant testimony below:

> Q And assuming an individual with those two past occupations with at least a high school education under the age of 50, let me pose a few hypotheticals related to that. If you assumed an individual that could occasionally lift or carry 20 pounds and frequently 10 [sic] that would be limited to standing or walking 2 hours out of a typical workday who would be limited to frequent reaching and handling, that would preclude those past occupations. Is that correct?

A That is correct, Judge.

Q Are there other occupations that such an individual could perform that you're familiar with?

A Judge, I would find this hypothetical sitting, the job of -- one moment, office helper. And that DOT is 239.567-010, unskilled, SVP of 2 and light with estimated job numbers at 88,000 in the national economy. There would also be inspector/hand packager, DOT 559.687-074, unskilled, SVP of 2 and light with estimated job numbers at 80,000 in the national economy. And then, Judge, there would be electrical assembly under DOT 729.687-010, unskilled, SVP of 2 and light with estimated job numbers at 85,000 in the national economy.

Q Have you seen those three occupations performed?

A Yes.

(R. 66-67.)

Based on this line of questioning, the hypothetical person posed to the VE could occasionally lift or carry 20 pounds, could frequently lift or carry 10 pounds, was limited to standing or walking 2 hours out of a typical workday, and was limited to frequent reaching and handling.  The hypothetical person's limitations correspond to the limitations set forth in the RFC.  (*See* R. 27 ("to perform sedentary work as defined in 20 CFR 404.1567(a) except: lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours and standing and/or walking for 2 hours out of a typical workday; frequent reaching and handling").)  The VE testified that such a hypothetical person could perform the office helper; inspector, hand packager; and electrical assembly

jobs while simultaneously recognizing that the DOT defined them as "light."[49]  (R. 67.)

She also testified that she had seen all three occupations performed.  (R. 67.)

"Generally, when expert testimony conflicts with the DOT, it is the DOT which

controls.  The DOT classifications may be rebutted, however, with VE testimony which

shows that particular jobs, whether classified as light or sedentary, may be ones that a

claimant can perform."  *Montgomery v. Chater*, 69 F.3d 273, 276 (8th Cir. 1995) (cleaned

up).  Here, the VE testified that a person having the limitations set forth in the RFC could

perform the jobs of office helper; inspector, hand packager; and electrical assembler.  (R.

67.)  While Plaintiff relies on the DOT definitions of these three jobs as "light," the

Eighth Circuit has found that "a claimant's 'reliance on the DOT as a definitive authority

on job requirements is misplaced because DOT definitions are simply generic job

descriptions that offer the approximate maximum requirements for each position, rather

than their range.'"  *Page v. Astrue*, 484 F.3d 1040, 1045 (8th Cir. 2007) (quoting

*Wheeler*, 224 F.3d at 897).  In sum, "[t]he record in the present matter, including the

testimony of the vocational expert, who answered a hypothetical that included

[Plaintiff's] limitations, supports the ALJ's conclusion that [Plaintiff] could perform

certain available jobs within the economy."  *Wheeler*, 224 F.3d at 897.  Accordingly,

notwithstanding the inartful questioning and testimony, the Court finds any failure by the

ALJ to comply with SSR 00-4p was harmless given the VE's testimony that a

hypothetical person having the limitations set forth in the RFC—including that of

---

[49]    The VE's testimony, while unclear, indicates she "would find this hypothetical
**sitting**," suggesting the job could be performed while seated.  (R. 67 (emphasis added).)

standing/walking for 2 hours out of a workday—could perform the occupations of office

helper; inspector, hand packager; and electrical assembly, meaning there is no conflict.

> Moreover, the ALJ stated:
>
> Notably, the vocational expert testified that the above Step-5 jobs are light, but could be performed sitting. (See Hearing Record).
>
> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is generally consistent with the information contained in the Dictionary of Occupational Titles (DOT) and the companion Selected Characteristics of Occupations (SCO), and to the extent not consistent, a reasonable and supported explanation has been provided. . . .

(R. 36.)  This complies with the requirement that an ALJ explain how they resolved any

conflict.

For all of these reasons, the Court finds Plaintiff's step five arguments

unpersuasive.  The Court further finds the ALJ's step five conclusions supported by

substantial evidence, including the VE's testimony based on the hypothetical question

that incorporated the limitations of the RFC.

* * *

For all of these reasons, Plaintiff's request for remand is denied and the

Commissioner's request that the Court affirm the ALJ's decision is granted.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS**

**ORDERED** that:

1.    The request for remand in Plaintiff Brock W. D.'s SSA Brief (Dkt. 9) is

**DENIED**;

2.    The request that the Court affirm the Commissioner's decision in

Defendant's SSA Brief (Dkt. 11) is **GRANTED**; and

3.    Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 28, 2025                              *s/Elizabeth Cowan Wright*
                                                   ELIZABETH COWAN WRIGHT
                                                   United States Magistrate Judge